STATE OF NORTH CAROLINA v. PHILLIP LEE INGLE

No. 98A93

(Filed 29 July 1994)

1. **Homicide § 552 (NCI4th)— first-degree murder—expert testimony—inability to distinguish right and wrong—submission of second-degree murder not required**

Testimony by defendant's expert witness in a first-degree murder prosecution that defendant was in a psychotic state and was unable to distinguish between right and wrong at the time of the murder was insufficient to require the trial court to submit the lesser charge of second-degree murder where the witness never indicated that at the time of the murder defendant was unable to premeditate or deliberate his actions. The ability to distinguish between right and wrong and the ability to premeditate and deliberate are entirely different considerations, and testimony that defendant lacked the ability to engage in the *higher* function of determining the moral acceptability of his actions does not negate or call into question his ability to plan his actions and to premeditate and deliberate.

**Am Jur 2d, Homicide §§ 525 et seq.**

2. **Criminal Law § 15 (NCI4th)— test of insanity**

In order for a defendant to be exempt from criminal responsibility for an act by reason of insanity, he must prove to the satisfaction of the jury that at the time of the act, he was laboring under such a defect of reason caused by disease or a deficiency of the mind that he was incapable of knowing the nature and quality of his act or, if he did know the nature and quality of his act, that he was incapable of distinguishing between right and wrong in relation to the act.

**Am Jur 2d, Criminal Law §§ 46 et seq.**

**Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.**

3. **Criminal Law § 669 (NCI4th)— insanity defense—sufficient evidence of sanity—directed verdict properly denied**

In a prosecution of defendant for two first-degree murders wherein defendant's expert witness testified that defendant was in a psychotic state and was unable to distinguish between

right and wrong at the time of the crimes, there was sufficient evidence of defendant's sanity to withstand his motion for a directed verdict of not guilty by reason of insanity where there was evidence tending to show that immediately after leaving the victims' house with the female victim's pocketbook, defendant set fire to the pocketbook; he returned a short time after doing so, retrieved the pocketbook, and threw it and the murder weapon (an axe) into a nearby creek; when discussing his crime with a friend, he stated that "I wouldn't be telling you this, but I know I can trust you . . ."; he also stated, while gesturing to his daughter, that he had too much to lose and too much to live for to get caught; and his wife told defendant's expert witness that defendant had behaved normally in the period following the murders in question and preceding two other murders.

**Am Jur 2d, Trial §§ 1030 et seq.**

4. **Evidence and Witnesses § 318 (NCI4th)— first-degree murders—evidence of subsequent murders—admissibility to corroborate confession and show identity**

In a prosecution of defendant for the first-degree murders of an elderly couple by beating them to death with an axe handle, evidence that defendant beat another elderly couple to death with a tire iron six weeks later was relevant to corroborate defendant's confession and to assist in the determination of a number of facts in the present case, including the central fact of the identity of the victims' assailant. Even though defendant confessed to all four murders, the probative value of the evidence was not substantially outweighed by its prejudicial effect since the State was required to produce corroborative evidence beyond defendant's confession, and testimony concerning the subsequent murders under similar circumstances had substantial probative value of defendant's criminality and guilt of the murders in question.

**Am Jur 2d, Homicide § 312.**

5. **Evidence and Witnesses § 1346 (NCI4th)— mental capacity to waive rights and confess—sufficiency of evidence**

The evidence on voir dire did not show that defendant lacked the mental capacity to waive his rights and confess, and the trial court did not err by concluding that defendant knowingly and understandingly waived his rights and that

defendant's inculpatory statements were admissible in his murder trial, where defendant offered no evidence that tended to show that he was insane or that he did not voluntarily and understandingly waive his rights; an SBI agent testified that at the time defendant was being questioned, he responded appropriately and completely and did not appear to be under the influence of alcohol or drugs; defendant responded to the questions in a sensible manner and did not exhibit any bizarre or unusual behavior whatsoever; and during questioning, defendant chose not to answer certain questions and eventually decided on his own that he should not answer further questions without the assistance of an attorney.

**Am Jur 2d, Evidence § 744.**

6. **Criminal Law § 445 (NCI4th) — first-degree murder — jury argument against lesser verdict — no impropriety**

The prosecutor's jury argument in a first-degree murder trial that it was his preference that the jury should "throw the whole thing out of this courtroom" rather than return a verdict of second-degree murder with regard to both victims was not an impermissible statement of opinion and was not improper. There is no impropriety in a statement by the prosecution requesting that the jury return a verdict of guilty of the most serious crime charged and requesting that the jury not consider a verdict convicting defendant of the lesser crime.

**Am Jur 2d, Trial § 554.**

7. **Criminal Law § 436 (NCI4th) — first-degree murder — jury argument against lesser verdict — comment on future crimes — fair inference based on evidence**

The prosecutor's jury argument in a prosecution for two first-degree murders that he would prefer to return defendant's axe handle to him and let him work his way up to seven victims rather than for the jury to return a verdict of second-degree murder in either case was not improper speculation that defendant would commit another murder if acquitted but was based upon fair inferences drawn from the evidence where the evidence showed that defendant murdered two other people six weeks after the murders for which he was on trial; defendant spontaneously told an SBI agent that he was glad he was caught because he would probably have done it again; defendant told a friend about the murders and said that he

STATE v. INGLE

[336 N.C. 617 (1994)]

enjoyed watching people dying and in agony; defendant offered to kill a friend's neighbor for him, stating that all he needed was an axe handle; defendant's expert stated that a "serial killer" might repeatedly kill someone and follow the same pattern in finding and killing the victim; and the expert responded affirmatively when asked on cross-examination whether this pattern could repeat itself on a "first, second, third, fourth, fifth, sixth, seventh occasion."

**Am Jur 2d, Trial § 554.**

8. **Criminal Law § 1343 (NCI4th) — capital sentencing — heinous, atrocious, or cruel aggravating circumstance — instructions not unconstitutionally vague**

The trial court's instructions on the especially heinous, atrocious, or cruel aggravating circumstance in a capital sentencing proceeding were not unconstitutionally vague.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like — post-Gregg cases. 63 ALR4th 478.**

9. **Criminal Law § 1344 (NCI4th) — capital sentencing — heinous, atrocious, or cruel aggravating circumstance — supporting evidence**

There was sufficient evidence to support submission of the aggravating circumstance that a murder was especially heinous, atrocious, or cruel since evidence that defendant attacked the elderly victim by surprise and beat his brains out of his head by repeated blows of an axe handle without the slightest provocation supported an inference that the murder was conscienceless and pitiless; evidence that defendant committed a similar set of murders just six weeks later, after a boastful discussion of his murderous capabilities with a friend, was further evidence of a lack of pity for the victim; and the facts of the case suggest a depravity of mind on the part of the defendant not easily matched by even the most egregious of slayings, as well as a level of brutality exceeding that ordinarily present in first-degree murders.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

STATE v. INGLE

[336 N.C. 617 (1994)]

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-Gregg cases. 63 ALR4th 478.

10. **Criminal Law § 1349 (NCI4th)— capital sentencing—evidence of mitigating circumstance—necessity for submission**

Where evidence is presented by the defendant or the State in a capital sentencing proceeding that supports a statutory mitigating circumstance, N.C.G.S. § 15A-2000(b) directs that the circumstance must be submitted for the jury's consideration absent defendant's request or even over defendant's objection.

**Am Jur 2d, Criminal Law §§ 598, 599.**

11. **Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstance—no significant criminal history—submission supported by evidence**

Evidence of defendant's criminal activity was slight enough for the submission, over defendant's objection, of the no significant history of prior criminal activity mitigating circumstance to the jury in a capital sentencing proceeding where the evidence of defendant's prior criminal activity consisted of testimony concerning his use of illegal drugs and testimony by defendant's aunt that she "took out warrants on him" for communicating threats and trespassing. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Criminal Law §§ 598, 599.**

12. **Criminal Law § 460 (NCI4th)— capital sentencing—jury argument—scenario of grandson's finding of bodies—proper inferences from evidence**

The prosecutor's jury argument in a capital sentencing proceeding for two murders that, in essence, speculated how the victims' seven-year-old grandson, when he became an old man of eighty-six years, would look back on the day when he "flew" into the home of his grandparents and encountered their dead bodies, finding that he could not kiss his grandparents because defendant had bludgeoned them to death, was a reasonable description of what may have taken place when the grandson entered the victims' home based upon the facts

and circumstances shown by the evidence and thus was not an argument of facts not in evidence.

**Am Jur 2d, Trial §§ 632 et seq.**

13. **Criminal Law § 468 (NCI4th)— capital sentencing—jury argument—subsequent murders—reference to persons killed as victims**

In a capital sentencing proceeding for two first-degree murders wherein two subsequent murders committed by defendant were relevant to show the heinous, atrocious, or cruel and course of conduct aggravating circumstances, the prosecutor's reference in his jury argument to the persons killed in the subsequent murders as "victims" was not misleading, prejudicial, or likely to cause the jury to return an improper sentencing recommendation against defendant for the first two murders.

**Am Jur 2d, Trial §§ 497 et seq.**

14. **Criminal Law § 454 (NCI4th)— capital sentencing—jury argument—no improper injection of religion**

The prosecutor's jury argument in a capital sentencing proceeding to the effect that when he said his prayers after the conclusion of the case, he would tell the Lord that he did his best, and that the jurors' decision should enable them to feel satisfied that they had done justice was not an improper appeal by the prosecutor for the jury to take religion into account when considering the sentence.

**Am Jur 2d, Trial § 572.**

15. **Criminal Law § 454 (NCI4th)— capital sentencing—jury argument—no diminishment of jury's responsibility**

The prosecutor's jury argument in a capital sentencing proceeding that defendant "authored and wrote his own death warrant. We're simply asking that you affix your signature as jurors and representatives of the citizens of Cleveland County" could not have improperly led the jury to believe that it was not responsible for determining the appropriateness of defendant's sentence. Rather, the argument is more properly viewed as having the opposite effect since a request that jurors affix their signatures to the verdict served to remind

them that they would decide the propriety of defendant's punishment for crimes committed by him.

**Am Jur 2d, Trial § 572.**

16. **Criminal Law § 458 (NCI4th) — capital sentencing — possibility of parole — comment during objection — harmless error — instruction on life sentence not required**

When defense counsel argued to the jury in a capital sentencing proceeding, "If you give him a life sentence, he spends the rest of his life down there," it was improper for the prosecutor to raise, by implication, the possibility of defendant's parole by his objection to "the implication that he will be there for the rest of his life," but this error was not prejudicial. Furthermore, the trial court properly declined to instruct the jury on the meaning of a life sentence.

**Am Jur 2d, Trial § 575.**

17. **Criminal Law § 1373 (NCI4th) — first-degree murders — death sentences not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant, where the jury found the especially heinous, atrocious, or cruel aggravating circumstance for one murder and the course of conduct aggravating circumstance for both murders, and the evidence showed that defendant consecutively bludgeoned two elderly persons in their home with an axe handle and that the murders were committed without provocation and for no apparent motive other than defendant's pleasure in committing the crimes. Defendant's assertion that the victims were taken completely by surprise and were killed instantly, if true, constitutes an insufficient basis upon which to conclude that the sentence of death is disproportionate. Nor is the sentence of death disproportionate because of evidence of defendant's insanity at the time of the murders where the jury refused to attribute defendant's actions to an inability to appreciate the nature and quality of his actions, and the jury likewise declined to find as mitigation that defendant suffered from mental disturbance at the time of the killings.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances — Supreme Court cases. 111 L. Ed. 2d 947.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by Downs, J., at the 8 February 1993 Criminal Session of Superior Court, Cleveland County, upon change of venue for trial from Rutherford County. Heard in the Supreme Court 9 May 1994.

*Michael F. Easley, Attorney General, by Joan H. Byers, Special Deputy Attorney General, for the State.*

*Harry H. Harkins, Jr., for defendant-appellant.*

MEYER, Justice.

On 14 October 1991, defendant, Phillip Lee Ingle, was indicted by a Rutherford County grand jury for the first-degree murders of William Fred Davis and Margaret Shufford Davis. On 12 November 1992, defendant's motion for change of venue due to pretrial publicity was granted by Judge Chase B. Saunders. Venue was changed to Cleveland County. The offenses were joined for trial on 8 February 1993. On 17 February 1993, the jury returned verdicts of guilty of first-degree murder on the basis of malice, premeditation, and deliberation. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court, on 19 February 1993, imposed the sentence of death in both cases.

Defendant has brought forth twenty-nine assignments of error. After a careful and thorough review of the transcript, the record, the briefs, and oral arguments of counsel, we conclude that defendant received a fair trial and sentencing proceeding, free from prejudicial error.

The evidence presented at trial tended to show the following: In July 1991, William Fred Davis, sixty-eight years old, and his wife, Margaret Shufford Davis, sixty-seven years old, lived in their home in a rural area of Rutherford County. The nearest residence was a mobile home located about 150 yards from the house, which defendant had rented from the Davises in 1987.

On Sunday, 28 July 1991, Mr. and Mrs. Davis were given a ride home from church. Mrs. Davis was carrying a light-beige pocketbook with a billfold inside it. Later that day, Kathy Davis,

the Davises' daughter-in-law, spoke with Mrs. Davis and saw Mr. Davis when he stopped by her home to deliver some vegetables. Ruth Blanton, the Davises' daughter, saw her father that afternoon in a field near his home and also spoke with her mother at the Davises' home. Mrs. Blanton again stopped by the Davises' home around 6:00 p.m. to borrow a vacuum cleaner. No one was at the home, but the back door was unlocked, so she picked up the vacuum cleaner and left.

Sometime between 6:00 p.m. and 8:45 p.m., defendant was driving around the area of the victims' home. He knew the Davises from having rented a mobile home from them in 1987. He went to the Davises' house and drove his car around to the back of the house. He parked his car, took an axe handle from it, and entered the house through the unlocked back door. Mrs. Davis was in the kitchen, and defendant approached her from behind and began to beat her on the head with the axe handle until she fell to the floor. After doing this, defendant went into the den of the house, where Mr. Davis was seated in a recliner watching television. Because Mr. Davis was hard of hearing, the television was turned up to a high volume, and the evidence tended to show that he was unaware that defendant had attacked his wife in the kitchen. After moving to the den, defendant attacked Mr. Davis and beat him on the head with the axe handle. Both Mr. and Mrs. Davis died as a result of the wounds inflicted by defendant.

The autopsies of Mr. and Mrs. Davis were conducted on 30 July 1991. There were six major lacerations on the scalp and face of Mrs. Davis. An internal examination revealed contusions, hemorrhaging into the brain, and multiple skull fractures. Also present were wounds to her left elbow and right hand that could have been sustained as she tried to defend herself or that could have been the result of a fall.

An external examination of Mr. Davis showed blood and brain tissue on his head, face, and clothing. Both of his eyes had been blackened, and he had bled into the substance of his left eye. His skull bones had been thoroughly fractured and pressed inward into his brain. There were twelve lacerations on his face and scalp. His dentures were protruding from his mouth. His left little finger was almost completely torn from his hand, and his left ring finger had abrasions on it. The wounds to Mr. Davis' hand could have been sustained as Mr. Davis tried to defend himself or could have

been caused by the hand resting on the top of Mr. Davis' head as the first blows were inflicted. The examining physician testified that the nature of the injuries to both victims was consistent with having been caused by a blunt instrument such as an axe handle.

After beating the couple to death, defendant left the house, taking Mrs. Davis' pocketbook and a floral-patterned dress that belonged to her. He then went to an area about three miles away from the Davises' home, discarded the dress, and set fire to the pocketbook and its contents. Defendant then departed the area. He returned to the area some time later, picked up the pocketbook, and threw it and the axe handle into a creek. Defendant later led law enforcement officers to the spot where he disposed of these items. The pocketbook was discovered on the bank of the stream, but the axe handle was never found.

While defendant was away from the area where the pocketbook was left burning, it was spotted by a local resident, who notified the Sheriff's Department. By the time the resident and a Sheriff's deputy returned to the spot, defendant had retrieved the pocketbook. The deputy did discover the dress that had belonged to Mrs. Davis.

Items found in the pocketbook after its recovery by police and at the site where it was partially burned were identified as items that had customarily been carried by Mrs. Davis, and the pocketbook itself was identified as one that had belonged to Mrs. Davis.

A police investigation of the Davis murders did not lead to an arrest for several weeks. During that time, in mid-August of 1991, defendant visited with his friend Jeff Houser. During a conversation with Houser, defendant made the statement, "Man, I killed two people. I beat them to death." Defendant asked Houser if he needed anyone killed, and Houser jokingly responded by indicating that he did and pointed to his neighbor's house. Defendant then began to ask questions about Houser's neighbor, so Houser told defendant that he was just kidding about wanting his neighbor killed and that the neighbor was "a real big guy and they're heavily armed." Defendant responded: "That doesn't matter. . . . [T]hey'll never see me coming. All I need is an ax handle." When Houser told defendant to forget about it, defendant responded: "Well, man, I wouldn't be telling you this, but I know I can trust you . . . ."

Some weeks later, around the 10th or 12th of September 1991, defendant returned to Houser's residence suffering from a black eye. Another visitor at Houser's home, Steve White, asked defendant about the black eye, and defendant stated that he "fell and hit a door knob." White did not believe that to be the truth and told defendant so. After asking Houser if he was still having trouble with his neighbor, defendant stated, "I'll take care of him for you." Defendant said, "I'll kill his whole family. . . . I'll get a stick. . . . I'll beat them to death." Defendant went on to say, "I love to watch people dying in agony. Pain. Suffering."

At the time of this second visit to Houser's residence, defendant had recently committed another double murder in Gaston County. Defendant had broken into the rural home of an elderly couple named E.Z. and Sarah Willis and had beaten them both to death with a tire iron. Defendant's black eye had been caused when Mr. Willis hit defendant in the head with his cane.

As a result of the conversations defendant had with Houser and White, the men contacted the State Bureau of Investigation (SBI). Subsequently, defendant was questioned by law enforcement officers with regard to the Willis murders. When questioned about the Davis murders, defendant stated, "Yeah, I killed them, too."

Defendant gave a statement that detailed his involvement in both the Willis and Davis murders. He did not offer any sort of motive for the murders but stated that he did not kill the victims for sexual gratification or to steal from them.

In his defense, defendant presented evidence designed to show that at the time of the murders, he was experiencing a psychotic episode that was the result of a borderline personality disorder. Defendant also presented evidence of an extremely troubled childhood in which he had witnessed his mother overdose on drugs and attempt to commit suicide in his presence on a number of occasions. Defendant himself had attempted suicide on more than one occasion, once attempting to hang himself from a tree at age five or six. On another occasion, at age nineteen, defendant stated that he wanted to kill himself and then shot himself in the stomach with a rifle. There was also evidence that defendant had been sexually abused by an older man while a child.

Defendant had been a continuous abuser of drugs and alcohol and had been periodically admitted to various hospitals and mental institutions for problems associated with drug and alcohol abuse.

STATE v. INGLE

[336 N.C. 617 (1994)]

A week or two prior to the Davis murders, defendant had been involved in an argument involving his grandmother, and it was defendant's psychiatric expert's opinion that it could have been the sight of elderly people, the Davises, that triggered what the expert characterized as the psychotic episode that resulted in the murders.

Other facts will be presented as necessary for the proper resolution of the issues brought forward by defendant.

[1] In his first assignment of error, defendant contends that it was error for the trial court to refuse to submit the lesser charge of second-degree murder with regard to the killing of Mr. Davis. The trial court did submit this offense with regard to the killing of Mrs. Davis.

"A trial court is required to instruct on a lesser included offense only when there is evidence to support a verdict finding the defendant guilty of the lesser offense." *State v. Gibbs*, 335 N.C. 1, 52, 436 S.E.2d 321, 350 (1993), *cert. denied*, --- U.S. ---, 129 L.Ed.2d 881 (1994); *see also State v. Woodard*, 324 N.C. 227, 376 S.E.2d 753 (1989). "When no evidence supports a lesser included offense, the trial court has no duty to instruct the jury on such offenses." *State v. Tucker*, 329 N.C. 709, 721, 407 S.E.2d 805, 812-13 (1991).

"Second degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Young*, 324 N.C. 489, 493, 380 S.E.2d 94, 96 (1989). "Only where defendant has brought forth evidence to negate the element of premeditation and deliberation, or where the evidence is equivocal as to premeditation and deliberation, is defendant entitled to an instruction on second-degree murder." *State v. Zuniga*, 320 N.C. 233, 260, 357 S.E.2d 898, 916, *cert. denied*, 484 U.S. 959, 98 L.Ed. 2d 384 (1987), *denial of post-conviction relief reversed on other grounds*, 336 N.C. 508, 444 S.E.2d 443 (1994).

Defendant contends that the testimony of his expert witness that he was in a psychotic state at the time of both murders was sufficient to negate or call into question the elements of premeditation and deliberation with regard to the murder of Mr. Davis. We disagree.

A careful review of defendant's expert's testimony reveals that the evidence presented called into question defendant's ability

STATE v. INGLE

[336 N.C. 617 (1994)]

to distinguish between right and wrong but never indicated that at the time of the crimes he was unable to premeditate or deliberate his actions. The psychiatrist testified that defendant's borderline personality disorder could have been the result of psychiatric trauma experienced as a child and that defendant's substance abuse was a symptom of this disorder. He further testified that the psychotic episode experienced by defendant at the time of the murders was a feature one would expect to see associated with borderline personality disorder. In addition, defendant's psychiatrist unequivocally stated that it was his opinion that at the time of the murders, defendant was unable to distinguish right from wrong and was unable to determine the nature and quality of his acts. The psychiatrist went on to testify that defendant told him that he looked in the window at the Davises, before entering the house, and after doing so, he returned to his car to retrieve an axe handle. The psychiatrist speculated that it could have been defendant's recent disagreement with his grandmother followed by the sight of elderly people that triggered defendant's psychotic episode.

Nowhere, however, is there any testimony that defendant was unable to plan his actions or that he lacked the ability to premeditate and deliberate.

The ability to distinguish between right and wrong and the ability to premeditate and deliberate are entirely different considerations. This distinction was explained by Justice Lake in *State v. Cooper*:

> For criminal responsibility it requires that the accused have, at the time of the act, the higher mental ability to distinguish between right and wrong with reference to that act. It requires less mental ability to form a purpose to do an act than to determine its moral quality. The jury, by its verdict, has conclusively established that this defendant, at the time he killed his wife and the four little children, had this higher level of mental capacity. It necessarily follows that he had the lesser, included capacity.

*State v. Cooper*, 286 N.C. 549, 573, 213 S.E.2d 305, 321 (1975). These principles, when applied to the present case, illustrate the weakness of defendant's argument. There was no evidence that defendant was unable to premeditate or deliberate with regard to his actions at the time of the murders. Testimony that defendant lacked the ability to engage in the *higher* function of determining

the moral acceptability of his actions, even if believed, does not negate or call into question his ability to plan his actions. Accordingly, such evidence does not justify the submission of an instruction on second-degree murder.

The trial court correctly refused to submit the charge of second-degree murder with regard to the killing of Mr. Davis. Defendant's assignment of error on these grounds is overruled.

In his next assignment of error, defendant contends that the evidence of his insanity at the time of the killings was uncontroverted, and for that reason, the trial court erred in denying defendant's motion to dismiss at the close of all the evidence or, as defendant contends, erred by not granting him the equivalent of a directed verdict. We disagree.

We note that although defendant did not specifically request a directed verdict on the issue of his insanity, it is well settled that a motion to dismiss and a motion for a directed verdict have the same effect. *State v. Mize*, 315 N.C. 285, 290, 337 S.E.2d 562, 565 (1985); *Cooper*, 286 N.C. at 568, 213 S.E.2d at 318.

"[I]n considering whether a trial court has erred in refusing to direct a verdict of not guilty by reason of insanity, we must bear in mind the rule that 'in all cases there is a presumption of sanity, and when there is other evidence to support this presumption, this is sufficient to rebut defendant's evidence of insanity . . . .' " *State v. Evangelista*, 319 N.C. 152, 162, 353 S.E.2d 375, 382 (1987) (quoting *State v. Mize*, 315 N.C. at 290, 337 S.E.2d at 565).

[2] In North Carolina, in order for a defendant to be exempt from criminal responsibility for an act by reason of insanity, he must prove to the satisfaction of the jury that at the time of the act, he was laboring under such a defect of reason caused by disease or a deficiency of the mind that he was incapable of knowing the nature and quality of his act or, if he did know the nature and quality of his act, that he was incapable of distinguishing between right and wrong in relation to the act. *State v. Bonney*, 329 N.C. 61, 405 S.E.2d 145 (1991); *State v. Mancuso*, 321 N.C. 464, 364 S.E.2d 359 (1988); *State v. Evangelista*, 319 N.C. 152, 353 S.E.2d 375; *State v. Mize*, 315 N.C. 285, 337 S.E.2d 562.

In the case of an unwitnessed crime, the question of the mental condition of a defendant at the precise time of the crime becomes especially problematic. Accordingly, courts have allowed evidence

of a defendant's actions at relevant times before and after the commission of the crime to serve as an indication of the defendant's mental condition at the time of the act. As we noted in *State v. Duncan*:

> To determine the issue as to whether the defendant was insane at the time of the alleged commission of the offense[,] evidence tending to show the mental condition of the accused both before and after the commission of the act, as well as at the time of the act charged, is competent, provided the inquiry bears such relation to the person's condition of mind at the time of the alleged crime as to be worthy of consideration in respect thereto. It would be impracticable to limit the evidence to such condition at the exact time.

*State v. Duncan*, 244 N.C. 374, 377, 93 S.E.2d 421, 423 (1956); *see also State v. Cooper*, 286 N.C. 549, 213 S.E.2d 305.

[3] In the present case, many details surrounding the commission of the crime serve to rebut defendant's contention that he was unable to appreciate the nature and quality of his actions at the time of the murders. Immediately after leaving the Davises' house with Mrs. Davis' pocketbook, defendant set fire to the pocketbook. He returned a short time after doing so, retrieved the pocketbook, and threw it and the murder weapon into a nearby creek. When discussing his crime with his friend Houser, he specifically stated, "Well, man, I wouldn't be telling you this, but I know I can trust you . . . ." He also stated, while gesturing to his daughter, that he had too much to lose and too much to live for to get caught. Defendant's expert testified that his wife had told him that defendant had behaved normally in the period following the Davis murders and preceding the Willis murders.

Although this evidence is not conclusive on the issue of whether defendant was insane at the time of the murders, in order for evidence of sanity to foreclose defendant's right to a directed verdict, it is sufficient if the evidence tends to controvert defendant's evidence that he was unable to distinguish between right and wrong at the time of the murders.

We hold that there was sufficient evidence of defendant's sanity to withstand his motion to dismiss made at the conclusion of the State's evidence. The trial court correctly denied the motion, and defendant's assignment of error on these grounds is overruled.

STATE v. INGLE

[336 N.C. 617 (1994)]

[4] In his next assignment of error, defendant contends that the trial court erred when it allowed the State to introduce evidence of the Willis murders, committed some six weeks after the crime at issue here. Defendant concedes that case law supports the trial court's conclusion that the evidence was relevant and admissible for purposes of showing defendant's state of mind, method of operation, and preparation, but argues that this evidence should nonetheless have been disallowed pursuant to Rule 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1992). Defendant contends that inasmuch as he had confessed to the murders in the Davis case as well as the Willis case, the testimony concerning the Willis murders added nothing to the State's case, served only to inflame the passions of the jury, and had "an *undue* tendency to suggest decision on an improper basis." *State v. Mercer*, 317 N.C. 87, 94, 343 S.E.2d 885, 889 (1986) (quoting N.C.G.S. § 8C-1, Rule 403 commentary (Supp. 1985) ). We disagree.

"[A] naked extrajudicial confession, uncorroborated by other evidence, is not sufficient to support a criminal conviction." *State v. Sloan*, 316 N.C. 714, 725, 343 S.E.2d 527, 534 (1986). "According to the law of this jurisdiction, the State must at least produce corroborative evidence, independent of defendant's confession, which tends to prove the commission of the charged crime." *Id.; see also State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985) (corroboration rule relaxed in noncapital cases). Accordingly, evidence of the Willis murders aided in the corroboration of defendant's confession.

In addition, the evidence at issue here was properly admissible under Rule 404, which provides that evidence of other crimes, wrongs, or acts may be admissible in order to show "proof of motive, opportunity, intent, preparation, plan, knowledge." N.C.G.S. § 8C-1, Rule 404(b) (1992). Accordingly, evidence of the Willis murders was relevant to assist in the determination of a number of facts in the present case, including the central fact of the identity of the Davises' assailant, thus meeting the relevancy requirements of Rule 401. Rule 402 provides that relevant evidence is generally admissible, subject to certain limitations. The admissibility of this type of evidence is further limited by the provisions of Rule 403, which provides that even the admissibility of relevant evidence is subject to a determination by the trial court that the probative

value of the evidence is not substantially outweighed by its prejudicial effect.

As this Court noted in *State v. Mercer,*

> Rule 403 calls for a balancing of the proffered evidence's probative value against its prejudicial effect. Necessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question, then, is one of degree. The relevant evidence is properly admissible under Rule 402 *unless* the judge determines that it must be excluded, for instance, because of the risk of *"unfair* prejudice."

317 N.C. at 93, 343 S.E.2d at 889. The decision whether to admit evidence subsequent to a Rule 403 analysis rests within the sound discretion of the trial court, and its ruling will not be overturned unless it is shown that the ruling was "manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986), *quoted in State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). Defendant has made no such showing.

The State was required to produce corroborative evidence beyond defendant's confession in order to secure a conviction of murder. Testimony concerning the Willis murders, committed under remarkably similar circumstances, had substantial probative value of defendant's criminality and guilt in the Davis murders. The record does not suggest that the prosecution presented evidence in an inflammatory manner or in a manner designed to inflame the passions of the jury. We hold that the trial court properly admitted evidence of the Willis murders; accordingly, defendant's assignment of error on these grounds is overruled.

[5] In his next assignment of error, defendant contends that the trial court erred when it denied his motion to suppress the inculpatory statement that he made to law enforcement officers subsequent to his arrest. As the basis for this assignment of error, defendant contends that at the time of the giving of the statement, he lacked the capacity to waive his rights. Defendant concedes that at the time of the motion hearing, no evidence was presented that he lacked the capacity to waive his rights at the time of the interrogation, but nonetheless requests that this Court examine the circumstances surrounding the hearing in order to determine whether the statement should have been admitted.

STATE v. INGLE

[336 N.C. 617 (1994)]

When a person is in the custody of a law enforcement officer,

> the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07 (1966). In the present case, defendant was given his *Miranda* warnings and initialed a written form that indicated that he understood his rights and was willing to answer questions without a lawyer. Even so, however,

> "the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly given. The fact that the technical procedural requirements of *Miranda* are demonstrated by the prosecution is not, standing alone, controlling on the question of whether a confession was voluntarily and understandingly made. The answer to this question can be found only from a consideration of all circumstances surrounding the statement."

*State v. Mlo*, 335 N.C. 353, 363, 440 S.E.2d 98, 102 (1994) (quoting *State v. Rook*, 304 N.C. 201, 216, 283 S.E.2d 732, 742 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982) ), *cert. denied*, --- U.S. ---, 129 L.Ed.2d 841 (1994). In the present case, defendant contends that he did not voluntarily and understandingly give his statement because he was insane at the time of questioning and lacked the capacity to waive his rights. An examination of the record indicates that this was not so.

In accordance with the requirements of N.C.G.S. § 15A-977(f), the trial court made findings of fact and conclusions of law with regard to defendant's motion to suppress. *See* N.C.G.S. § 15A-977(f) (1988). The trial court made the following findings of fact:

> That at the time of the interrogation, the defendant appeared to be in a reasonably good and healthy physical condition, having the only apparent—the only apparent wound or disfigurement being a black eye. That he was not under the influence of any alcohol or drugs. That his mental condition at and during the time of interrogation was coherent and one

of understanding. That the answers that he gave in response to the questions asked were reasonable ones and they were responsive ones.

That there were no promises or offers of reward or inducements made by law enforcement officers for the defendant to make any statement. That there were no threats or suggested violence or show of violence by any law enforcement officers to persuade or induce the defendant to make any statement.

That when the defendant did desire to stop talking and make no further statement and request the presence of a lawyer, no further questions were asked of him. That his—that his responses to questions asked of him were logical, straight forward, sensible and were not in the category of bizarre.

These findings of fact made by the trial court are binding on appeal if supported by competent evidence. *State v. James*, 321 N.C. 676, 365 S.E.2d 579 (1988). In the present case, the record indicates that these findings are fully supported by the testimony given during a *voir dire* examination of the police officer who took defendant's statement. With regard to defendant's mental condition, SBI Agent Dan Crawford testified that at the time defendant was being questioned, he responded appropriately and completely and did not appear to be under the influence of alcohol or drugs. He responded to the questions in a sensible manner and did not exhibit any bizarre or unusual behavior whatsoever. Defendant offered no evidence that tended to show that he was insane or that he did not voluntarily and understandingly waive his rights. The findings of the trial court are supported by the evidence; accordingly, we adopt them and consider them to be binding upon this Court.

"Nevertheless, the conclusions of law drawn from the facts found are not binding on the appellate court and 'are fully reviewable on appeal.'" *Mlo*, 335 N.C. at 365, 440 S.E.2d at 103 (quoting *State v. Mahaley*, 332 N.C. 583, 593, 423 S.E.2d 58, 64 (1992)). The focus of our inquiry on this appeal now is whether the conclusions reached by the trial court are supported by the findings of fact. Such an inquiry requires the Court to examine "all circumstances surrounding the statement." *Rook*, 304 N.C. at 216, 283 S.E.2d at 742.

The trial court concluded that "the defendant was in full understanding of his constitutional right to remain silent and his

right to counsel and all other rights; and that he freely, knowingly, intelligently and voluntarily waived each of those rights and thereupon made the statement to the officers."

An examination of all of the circumstances surrounding the giving of the statement leads this Court to the same conclusion. After having been given information that defendant might have been connected with the Gaston County murders of Mr. and Mrs. Willis, Agent Crawford and Detective Phillips of the Gaston County Police travelled to defendant's residence to question him about the murders. Upon arriving at defendant's residence, they informed him of the purpose of their visit. Because they were in the presence of defendant's wife and small children, the officers asked defendant if he wanted to discuss the matters outside of his mobile home and further asked him if he would accompany them to the police facilities in Gaston County. Defendant agreed to do so and attempted to contact his employer to let his employer know that he would either be late or not present for work that day. No questions were asked of defendant until he had waived his rights, and during the time period defendant was questioned, he did not act in an unusual or bizarre manner or otherwise give any indication that he was incapable of knowingly and understandingly waiving his rights. During questioning, defendant chose not to answer certain questions and eventually decided on his own that he should not proceed any further in answering questions without the assistance of an attorney.

Given the circumstances surrounding defendant's waiver of his rights and the lack of any evidence that defendant was insane at the time of the giving of the statement, we hold that the trial court correctly concluded that defendant knowingly and understandingly waived his rights and that it properly admitted his inculpatory statements. Defendant's assignment of error on these grounds is overruled.

In his next assignment of error, defendant argues that the trial court erred when it failed to correct what defendant contends was a grossly improper closing argument by the prosecutor at the conclusion of the guilt/innocence phase of the trial.

[6] In anticipation of an instruction that the jury could find defendant guilty of second-degree murder with regard to the killing of Mrs. Davis, the prosecutor stated the following:

STATE v. INGLE

[336 N.C. 617 (1994)]

[MR. LEONARD (Prosecutor):] And with respect to Mrs. Davis, they say, Oh, you ought to water this thing down. You ought to go back there and trade it out somehow. You ought to find him guilty—not guilty; but I suppose they're hoping at a very minimum in her case that you'll say he's guilty of no murder—of no more than murder in the second degree.

I tell you what. With respect to either one of these people— with respect to this lady right here, with respect to Mrs. Davis, I hope you'll do this. Before you come back in this case—

MR. BURWELL [Defense Counsel]: Objection.

MR. DAVIS [Defense Counsel]: Objection.

MR. LEONARD: —and say he's guilty—

THE COURT: Wait. Wait. Wait a minute.

MR. DAVIS: He's saying I hope.

THE COURT: Well, overruled. Go ahead.

MR. LEONARD: My gosh. My gosh. No wonder we're in the mess we're in. No wonder we're in a mess.

I hope you'll say with respect to this lady right here that this man is guilty also of murder in the first degree. And before you say in the death of this woman that this defendant's guilty of murder in the second degree, before you give him that benefit—or rather than give him that benefit, I'd rather see you just—

MR. BURWELL: Objection.

MR. LEONARD: —throw the whole thing out of the courtroom.

THE COURT: Overruled.

MR. LEONARD: Just throw the whole thing out. That's how strongly we feel about this. That's my contention. I contend that both cases ought to be thrown slam out of this courtroom before you water down either one of them based on this evidence. I would rather see you do that—

MR. BURWELL: Objection.

THE COURT: Overruled.

MR. LEONARD: — and turn him loose and return his ax handle to him—

MR. BURWELL: Objection.

MR. LEONARD: — and if he wants to, let him go to work—

THE COURT: Sustained.

MR. LEONARD: — all the way to seven [future victims].

Defendant's first assignment of error with regard to this portion of the prosecutor's argument is that it was improper for the prosecutor to state that it was his preference that the jury should "throw the whole thing out of this courtroom" rather than return a verdict of second-degree murder with regard to both victims. Defendant contends that this statement amounted to an impermissible statement of opinion on the part of the prosecutor.

We perceive no impropriety in a statement by the prosecution requesting that the jury return a verdict of guilty of the most serious crime charged and requesting that the jury not consider a verdict convicting defendant of the lesser crime. The prosecutor's role is to do just that: compel the jury to convict a defendant of the charges that the prosecution has attempted to prove at trial, not charges that the prosecution contends have no applicability. "[I]t is permissible for a prosecutor to ask the jury to return the highest degree of conviction and the most severe punishment available for the offense charged." *State v. Hager*, 320 N.C. 77, 84, 357 S.E.2d 615, 619 (1987). That the prosecutor stated that it was his preference that the cases be "thrown slam out this courtroom" rather than return a verdict that he contends is clearly contrary to the evidence presented by the State merits no relief for defendant. "The prosecutor's comments in this case were proper in light of his role as a zealous advocate for convictions in criminal cases." *State v. McCollum*, 334 N.C. 208, 227, 433 S.E.2d 144, 154 (1993).

[7] Defendant's next assignment of error with regard to this portion of the prosecutor's argument concerns what defendant characterizes as "an improper suggestion that defendant, if acquitted, would commit a crime." *State v. Zuniga*, 320 N.C. 233, 257, 357 S.E.2d 898, 914. The portion of the argument referred to by defendant is that part in which the prosecutor indicated that rather than return a verdict of second-degree murder, the prosecutor would

prefer to return defendant's axe handle to him and let him work his way up to seven victims.

It is true that this Court has disapproved of such arguments in the past. In *State v. Miller*, a breaking and entering case, the prosecutor argued that

"[the defendants] are storebreakers. Both of them. Sure, turn them loose. I could stand it myself. Personally, I could, just insofar [as] . . . I don't own any buildings. It would be . . . it would hurt me. Turn them loose they say. And if you do, buckle your knees tight and lock your houses in the evening. Get the merchant patrol in your front yard with you, German police dogs! And when they break through your defenses, ladies and gentlemen, don't cry on me down at the solicitor's office, and say 'What are you doing about it?' "

*State v. Miller*, 271 N.C. 646, 656, 157 S.E.2d 335, 344 (1967). In holding that this portion of the State's argument was improper, we noted that "the appealing defendants did not testify in their behalf, and they did not introduce any evidence as to their reputation for character. Yet, with no supporting evidence the solicitor defiled the characters of the defendants in his argument to the jury." *Id.* at 657, 157 S.E.2d at 344.

The particular facts of the present case, however, suggest that the comment was not merely improper speculation, but was grounded upon a substantial evidentiary basis.

After killing Mr. and Mrs. Davis, the uncontroverted evidence showed that defendant repeated his brutal crime just six weeks later. No explanation was ever given other than speculation that his "psychotic episode" could have been triggered by the sight of old people. The jury was informed that while in custody and after termination of questioning, defendant had voluntarily and spontaneously stated to SBI Agent Crawford that "I'm glad that y'all caught me. . . . I'd have probably done it again." Before defendant was apprehended, he had told a friend about the murders and said that he enjoyed watching people dying and in agony. He offered to kill his friend's neighbor for him, stating that all he needed was an axe handle. Defendant's expert explained that, although he was not familiar with the particular diagnostic criteria involved, a "serial killer" might "repeatedly kill somebody and usually [follow] the same type pattern in his finding . . . a victim and

killing the victim." This expert responded affirmatively to the prosecutor's inquiry on cross-examination whether this pattern could repeat itself on a "first, second, third, fourth, fifth, sixth, seventh occasion."

We believe the circumstances of the present case warrant the conclusion that this portion of the argument, taken in context and in light of the testimony given at trial, was based upon fair inferences drawn from the evidence and, as such, was not improper. Defendant's assignment of error on these grounds is overruled.

In his next assignment of error, defendant contends that the trial court erred when it submitted the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder of Mr. Davis was especially heinous, atrocious, or cruel.

[8] In his first argument on the submission of this factor, defendant contends that the jury instructions concerning the circumstance are unconstitutionally vague. Defendant concedes that this Court has consistently decided this question otherwise and presents no argument as a basis to depart from our earlier decisions on the matter. See State v. Syriani, 333 N.C. 350, 391-92, 428 S.E.2d 118, 139-41, cert. denied, --- U.S. ---, 126 L. Ed. 2d 341 (1993), reh'g denied, --- U.S. ---, 126 L. Ed. 2d 707 (1994); State v. Fullwood, 323 N.C. 371, 399-400, 373 S.E.2d 518, 535-36 (1988), sentence vacated on other grounds, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), on remand, 329 N.C. 233, 404 S.E.2d 842 (1991). We have reviewed the instructions given for this aggravating circumstance and find them to be nearly identical to those expressly approved by this Court in the past. Defendant's assignment of error on these grounds is overruled.

[9] Defendant next contends that the evidence of the circumstances of Mr. Davis' killing did not warrant the submission of the instruction. Defendant contends that because the evidence showed that Mr. Davis was unaware of his assailant's presence and was rendered unconscious by the first blow, he did not suffer any of the physical or psychological torture that would cause his murder to be "especially" heinous, atrocious, or cruel. We disagree.

The interpretation of events posited by defendant is not the proper scenario upon which the trial court is to base its decision of whether to submit this aggravating circumstance. Rather, " '[i]n determining if there is sufficient evidence to submit an aggravating

circumstance to the jury, the trial judge must consider the evidence in the light most favorable to the State.'" *State v. Quick*, 329 N.C. 1, 31, 405 S.E.2d 179, 197 (1991) (quoting *State v. Huff*, 325 N.C. 1, 55, 381 S.E.2d 635, 666 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991)). "The State is entitled to every reasonable inference to be drawn from the facts. Contradictions and discrepancies are for the jury to resolve, and all evidence admitted which is favorable to the State is to be considered." *State v. Gibbs*, 335 N.C. 1, 61, 436 S.E.2d 321, 356. In addition, the decision to submit the factor does not entirely center around the experience endured by the victim during the killing. As we noted in *State v. Gibbs*:

> We have identified several types of murders which may warrant submission of circumstance (e)(9): One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328 (1988). A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), including those which leave the victim in her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown*, 315 N.C. at 65, 337 S.E.2d at 827.

*Gibbs*, 335 N.C. at 61-62, 436 S.E.2d at 356. We believe the murder in the present case easily meets the criteria outlined in several of the categories that this Court has previously identified as indicative of a murder that is especially heinous, atrocious, or cruel.

The evidence, supported by defendant's own account of the events, shows that defendant beat Mr. Davis on the head so hard that the fractures in his skull could be felt underneath his scalp. Bits of Mr. Davis' brain were on his shirt, his dentures protruded from his mouth, and there were a total of twelve lacerations on his face and head. There was blood spattered about the room and surrounding the reclining chair in which Mr. Davis' body was found.

When a murderer attacks an elderly victim by surprise and beats his brains out of his head by repeated blows of an axe handle

without the slightest sign of provocation, it may be said that there is an inference that the murder was conscienceless and pitiless. Evidence that defendant committed a similar set of murders just six weeks later, after a boastful discussion of his murderous capabilities, is further evidence of a lack of pity for defendant's victims. The facts of this case suggest a depravity of mind on the part of the killer not easily matched by even the most egregious of slayings, as well as a level of brutality that exceeds that ordinarily present in first-degree murders. *See* N.C.P.I.—Crim. 150.10, at 18-19 (1992). We hold that there was sufficient evidence to support the submission of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Defendant's assignment of error on these grounds is overruled.

[10] In his next assignment of error, defendant contends that the trial court erred when it submitted, over his objection, the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance that defendant had no significant history of prior criminal activity. Defendant acknowledges the series of cases in which this Court has held that where evidence is presented in a capital sentencing proceeding that may support a statutory mitigating circumstance, N.C.G.S. § 15A-2000(b) directs that the circumstance must be submitted for the jury's consideration absent defendant's request or even over his objection. *See State v. Gibbs*, 335 N.C. at 61, 436 S.E.2d at 352-53; *State v. Mahaley*, 332 N.C. at 597, 423 S.E.2d at 66; *State v. Artis*, 325 N.C. 278, 314, 384 S.E.2d 470, 490 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 601 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991); *State v. Lloyd*, 321 N.C. 301, 311-13, 364 S.E.2d 316, 324, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988), *on remand & sentence reinstated*, 323 N.C. 622, 374 S.E.2d 277 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 329 N.C. 662, 407 S.E.2d 218 (1991); *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 825 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). "Even when a defendant offers no evidence to support the existence of a mitigating circumstance, the mitigating circumstance must be submitted when the State offers or elicits evidence from which the jury could reasonably infer that the circumstance exists." *State v. Stokes*, 308 N.C. 634, 652, 304 S.E.2d 184, 195-96 (1983).

STATE v. INGLE

[336 N.C. 617 (1994)]

[11] Accordingly, it is this Court's duty only to review the evidence brought forth at trial in order to determine whether the submission of the circumstance was proper.

A review of the record indicates that evidence of defendant's prior criminal activity consisted principally of testimony concerning his use of illegal drugs. In addition, the State's cross-examination of defendant's aunt revealed that she "took out warrants on him" for communicating threats and trespassing. Despite the fact that some of these activities were unadjudicated crimes, it is proper for the trial court to take these activities into account in making its determination of whether to submit the (f)(1) mitigating circumstance. *State v. Noland*, 312 N.C. 1, 20-21, 320 S.E.2d 642, 654 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L. Ed. 2d 342 (1985), *post-conviction relief granted on other grounds sub nom. Noland v. Dixon*, 831 F. Supp. 490 (W.D. N.C. 1993); *State v. Stokes*, 308 N.C. at 653-54, 304 S.E.2d at 196.

There was sufficient evidence presented at trial to warrant the submission of the circumstance. We hold that the trial court correctly submitted the mitigating circumstance that defendant had no significant history of prior criminal activity.

Defendant's contention at trial in opposition to the submission of this mitigating circumstance was that his criminal history was in fact significant and that the judge should have so found as a matter of law and refused to submit the circumstance. We disagree.

Defendant's position loses force when we compare the present case to those in which this Court has determined whether the trial court correctly determined whether the factor should or should not have been submitted. One such case is *State v. Mahaley*, in which this Court held that the defendant was entitled to a new sentencing hearing because the trial court did not submit the (f)(1) mitigating circumstance. In that case, "[e]vidence of prior history of criminal activities was limited to that tending to show [the defendant's] use of illegal drugs and her theft of money and credit cards to support her drug habit." *Mahaley*, 332 N.C. at 597, 423 S.E.2d at 67.

In the case of *State v. Lloyd*, we held that the trial court correctly submitted the circumstance, despite defendant's objection, when the evidence showed two felony convictions and convic-

tions for seven alcohol-related misdemeanors. *Lloyd*, 321 N.C. at 312, 364 S.E.2d at 324.

In *State v. Wilson*, we held that the trial court erred in refusing to submit this mitigating circumstance when the record showed that the defendant possessed a criminal history that included a prior felony conviction for second-degree kidnapping, storage of illegal drugs in his shed, and involvement in the theft of farm equipment near the time of the murder. *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988).

It is thus clear that the evidence of criminal activity in the present case was slight enough to call for the submission of this circumstance for the jury's consideration. Defendant's assignment of error on these grounds is overruled.

In his next assignment of error, defendant alleges that the trial court erred when it refused to correct what defendant contends were improper and inflammatory portions of the prosecution's sentencing phase argument. Defendant assigns error to several portions of the argument, and we shall address them *seriatim*.

[12] Defendant's first complaint with regard to the prosecutor's argument concerns the prosecutor's depiction of what might have taken place when the Davises' grandson, Paul, discovered them dead in their home. The prosecutor engaged in a lengthy argument that, in essence, speculated how Paul, when he became an old man of eighty-six years, would look back on the day when he "flew" into the home of his grandparents and encountered their dead bodies, finding that he could not kiss his grandma and grandpa because defendant had bludgeoned them to death. Counsel for defendant made twelve objections during this portion of the argument.

Defendant argues that there is no evidence whatsoever that Paul tried to "fly into grandpa's arms" and "kiss grandpa's sweet old head" and that it was improper for the prosecutor to argue facts not in evidence.

This Court has had the opportunity to review similarly styled arguments in the past. In *State v. Syriani*, the prosecutor argued that the defendant in that case, after having killed his wife, cut short his departure from the scene of the killing in order to return and kill his daughter. The prosecutor argued that "[b]ut for a good citizen who was willing to put himself in harm's way between [the daughter] and the Defendant, we would be trying a triple murder

here today." *Syriani*, 333 N.C. at 398, 428 S.E.2d at 144. After citing the well-established rule that "[c]ounsel are entitled to argue to the jury all the law and facts in evidence and all reasonable inferences that may be drawn therefrom," *id.*, we held that the prosecutor's "arguments, although touching upon facts not testified to, were reasonable inferences based on the evidence and were within the wide latitude properly given counsel in argument," *id.* at 398-99, 428 S.E.2d at 144.

In *State v. Kirkley*, the defendant alleged that it was error for the prosecutor to create, in oral argument, a "scenario" of each of the crimes committed by the defendant. We again stated the rule that attorneys are allowed to argue all reasonable inferences drawn from the facts and held that "there was sufficient evidence from which the prosecutor's scenarios of how each murder was committed could reasonably be inferred." *State v. Kirkley*, 308 N.C. 196, 212, 302 S.E.2d 144, 153 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). The same is true in the present case with regard to what may have occurred when Paul discovered the dead bodies of his grandparents.

The evidence showed that when the Davises' daughter, Ruth Davis Blanton, arrived at the house with her children, seven-year-old Paul entered the house ahead of her as she began to unload certain items from the car. Moments later, Paul ran from the house "screaming that everybody was dead." Mrs. Blanton then went into the house to retrieve the two-year-old, who was standing near the clearly visible body of Mrs. Davis, which was on the floor surrounded by blood. By the time Mrs. Blanton exited the house, Paul was in her car crying. Mrs. Blanton testified that her son was terrified and very upset.

Although the prosecutor's portrayal and characterization of Paul's reaction that day is too lengthy to fully reproduce here, we have reviewed the record and find that the argument was a reasonable description of what may have taken place that day when Paul entered the house. Paul was a seven-year-old child going to visit the home of his grandparents. Despite the absence of evidence of Paul's personal relationship and feelings toward his grandparents, the prosecutor's emphasis on the inherent tragedy of the episode and Paul's reaction were a reasonable extrapolation of what may have been the thoughts and actions of such a boy upon encountering

such a grisly scene. "Prosecutorial arguments are not placed in an isolated vacuum on appeal. Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred." *State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221-22, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994). It cannot be said that this argument was unsupported by the evidence or by any facts or circumstances permitting such an inference. Defendant's assignment of error on these grounds is overruled.

[13] In his next assignment of error with regard to the prosecutor's sentencing phase argument, defendant contends that references to the Willises as "victims . . . in this case" was improper because such a reference constituted use of evidence of the Willises' deaths in a manner that exceeded the purposes for which that evidence was admitted at trial.

The Willis murders, which occurred six weeks after the Davis murders, were admitted in the guilt/innocence phase of the trial for the purpose of showing defendant's state of mind, identity, and plan during the Davis murders. In the sentencing phase, however, the Willis murders became relevant with regard to other issues, including (1) defendant's depravity of mind at the time of and following the Davis murders, which was relevant for the purpose of demonstrating that the Davis murders were especially heinous, atrocious, or cruel; and (2) the aggravating circumstance that the Davis murders were part of a course of conduct that included crimes of violence against others. *See State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692 (1992) (similarity of murders warrants submission of the course of conduct aggravating circumstance despite murders being twenty-six months apart). In addition, we note that the prosecutor did not specifically argue that the Willises were "victims . . . in this case" but, instead, recalled that Mr. Willis "laid a lick on the head of [defendant]" and said, "thank goodness for that. At least the victims got a lick in somewhere in this case."

Defendant acknowledges that this Court has held that if "evidence of the other deaths was properly admitted as components of the [S]tate's case, it was not error for the district attorney to refer to them in his argument before the jury." *State v. Barfield*,

298 N.C. 306, 330, 259 S.E.2d 510, 530 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). Defendant contends, however, that by referring to the Willises in such a manner in his sentencing argument, the prosecutor somehow went beyond the limits of what may fairly be asserted in his sentencing phase arguments. We disagree.

The prosecutor's brief reference to the Willises as "victims," taken in context, cannot be said to be misleading, prejudicial, or likely to cause the jury to return an improper sentencing recommendation against defendant for the murder of the Davises. We hold that the trial court properly overruled defendant's objections to this portion of the argument, and defendant's assignment of error on these grounds is likewise overruled.

[14] In his next assignment of error with regard to the prosecutor's sentencing phase argument, defendant alleges that the prosecutor improperly injected his own religious beliefs into the argument by making such comments, over defendant's objections, as:

> MR. LEONARD: I'm going to go back to Polk County, if the Lord will let me live long enough to get there. I'm going back to Polk County and I'm going to lay my head down on my pillow tonight and I'm going to sleep a good sleep, I believe and hope. And when I lay my head down on that pillow, I'm going to say, Lord, I did my best.
>
> MR. BURWELL: Objection.
>
> THE COURT: Overruled.
>
> MR. LEONARD: I did everything I could do. I did everything I could do, and I hope I'll get a good night's sleep. See, that's my privilege. That's the luxury that I have right now because I've had my say. I've done everything I can do for the citizens of the state, the citizens of this county, the other counties and people affected. I've done everything I can do for these folks. I've done all I can do for you.
>
> MR. BURWELL: Objection.
>
> THE COURT: Overruled.
>
> MR. LEONARD: I've done all I can do. And I'll lay my head down on my pillow and when I say my prayers, that's what I'll say to the Lord and I'll have a good conscience about

it. I'm fortunate, though, because I'm about to sit down and leave you to these gentlemen and then submit you to your obligations as jurors.

When you go to bed tonight or tomorrow night, whenever it is, you do back in that jury room what you think you need to do and what you think will enable you to lay your head down on your pillow and your bed in your home here in Cleveland County and to feel satisfied that what you did was just, was justice. Coming back to justice. That's what we've wanted you to do all the way along. You've done justice all along. And as I say, we're simply asking that you extend justice to its logical conclusion.

Defendant contends that this argument amounted to an improper appeal to the jurors' religious beliefs inasmuch as it was an implication that only a sentence of death would allow them to be at peace with the Lord at the conclusion of their role in the case. As such, defendant contends, the argument violated the prohibition against the improper invocation of religious beliefs in jury argument.

This Court has in the past disapproved of prosecutorial arguments that made improper use of religious sentiment. *See, e.g., State v. Moose*, 310 N.C. 482, 501, 313 S.E.2d 507, 519-20 (1984) (argument that the power of public officials is ordained by God and to resist them is to resist God disapproved); *State v. Oliver*, 309 N.C. 326, 359, 307 S.E.2d 304, 326 (1983) (indicating the impropriety in arguing that the death penalty is divinely inspired). On the other hand, "this Court has repeatedly noted the wide latitude allowed counsel in arguing hotly contested cases, *e.g., State v. Britt*, 288 N.C. 699, 220 S.E.2d 283 (1975); *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, and it has found biblical arguments to fall within permissible margins more often than not." *Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500.

The complained-of argument may more properly be characterized as a request that the jury fulfill its duty to render a verdict in accordance with the dictates of justice and was not a direct appeal by the prosecutor to take religion into account when considering the sentence. The argument does not contain the extensive references to religion, including copious readings from the Bible urging that murderers be put to death, against which we have cautioned in the past. *See, e.g., id.* (amalgamation of biblical language and statutory citation swings close to impropriety of saying the law of the State

codifies divine law). Defendant's assignment of error on these grounds is overruled.

[15] In his next assignment of error with regard to the prosecutor's sentencing argument, defendant contends that it was error for the prosecutor to argue that defendant "authored and wrote his own death warrant. We're simply asking that you affix your signature as jurors and representatives of the citizens of Cleveland County." Defendant contends that this argument improperly diminished the jury's sense of responsibility with regard to its sentencing determination. *See Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231 (1985).

In *Caldwell v. Mississippi*, the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29, 86 L. Ed. 2d at 239. We do not believe that this portion of the argument led the jury to believe that it was not responsible for determining the appropriateness of defendant's sentence. The argument, taken in context, is more properly viewed as having the opposite effect: requesting the jurors to affix their signatures to the verdict served to remind them that it was they who would decide the propriety of defendant's punishment for crimes committed by him. Defendant's assignment of error on these grounds is overruled.

In defendant's final contention with regard to the prosecutor's sentencing argument, he contends that the cumulative effect of each of these alleged errors warrants a new trial. Again, we disagree. Defendant's contentions, taken alone or cumulatively, are not sufficient to warrant the reversal of the outcome of his sentencing hearing. Defendant's assignments of error with regard to the prosecutor's argument are overruled.

[16] In his next assignment of error, defendant contends that he is entitled to a new sentencing hearing because the prosecutor improperly commented upon the possibility of parole during the sentencing phase.

The following exchange occurred at trial:

[MR. BURWELL:] I submit to you it's a hard question as to which is worse. If you kill him. It's quick. It's over. If

you give him a life sentence, he spends the rest of his life down there thinking about it.

MR LEONARD: Objection, Your Honor please. The implication he will be there for the rest of his life.

MR. BURWELL: Objection.

MR. LEONARD: State versus Ross, 311 North Carolina 408—

MR. BURWELL: Your Honor—

MR. LEONARD: —Improper argument.

MR. BURWELL: Your Honor—

THE COURT: Wait just a minute. Overruled.

MR. BURWELL: Can the jury be instructed not to—

THE COURT: Overruled. Continue with your argument.

Defendant contends that because the trial court did not give a cautionary instruction with regard to the prosecutor's comment, the jury was left with the impression that defendant might be paroled if given a life sentence, thus improperly introducing the issue of parole into the sentencing proceedings. It is true that "a criminal defendant's status under the parole laws is irrelevant to a sentencing determination and, as such, cannot be considered by the jury during sentencing, whether in a capital sentencing proceeding under N.C.G.S. § 15A-2000 or in an ordinary case." *State v. Robbins*, 319 N.C. 465, 518, 356 S.E.2d 279, 310, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). Accordingly, it was improper for the prosecutor to raise, by implication, the possibility of defendant's parole if he had been given a life sentence. We do not find it necessary, however, to examine the effect of the trial court's overruling of the prosecutor's objection, as the issue of whether it was improper for defense counsel to argue as he did is not the issue before the Court. Instead, we look to the impact of the uncorrected statement of the prosecutor made during the course of his objection.

In order for an improper prosecutorial comment to warrant a new trial, the comment must have amounted to prejudicial error. *State v. Green*, 336 N.C. 142, 186, 443 S.E.2d 14, 40 (1994); *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487-88 (1992); *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977). In the context

of an improper prosecutorial comment, properly objected to, which does not implicate a specifically guaranteed constitutional right, the standard of review for prejudice is whether the defendant has shown that there is a reasonable possibility that had the error in question not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988).

In the present case, defendant has not met this burden. The comment was relatively innocuous and came as part of the prosecutor's objection to what was arguably an improper statement made by defendant's counsel. *See State v. Boyd*, 311 N.C. 408, 425 n.1, 319 S.E.2d 189, 201 n.1 (1984) (disapproving of defense counsel's attempt to inform the jury that defendant would spend the rest of his life in prison if life sentence imposed), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985). The trial court overruled the State's objection, and defense counsel was allowed to proceed with his argument. The remark did not amount to prejudicial error; accordingly, defendant's assignment of error on these grounds is overruled.

Defendant further argues that, as a result of the prosecutor's comment, he was entitled to have the trial court instruct the jury on the meaning of a life sentence. We disagree. Such an instruction is warranted if the jury inquires about the meaning of a life sentence or the eligibility of defendant for parole. "We have not held that the jury is to be so instructed in the absence of such inquiry." *State v. Robinson*, 336 N.C. 78, 124, 443 S.E.2d 306, 329. The trial court properly declined to instruct the jury as to the meaning of a life sentence; accordingly, defendant's assignment of error on these grounds is overruled.

## PROPORTIONALITY REVIEW

[17] We have reviewed the guilt-innocence phase and the sentencing phase of defendant's trial and have found no error. It is now the duty of this Court to review the record and determine (1) whether the record supports the jury's finding of the aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988).

STATE v. INGLE

[336 N.C. 617 (1994)]

The following aggravating circumstances were submitted to the jury with regard to the murder of Mr. William Fred Davis:

(1) Was the murder of William Fred Davis especially heinous, atrocious or cruel? [N.C.G.S. § 15A-2000(e)(9) (1988).]
. . . .

(2) Was the murder of William Fred Davis part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the Defendant of other crimes of violence against another person or persons? [N.C.G.S. § 15A-2000(e)(11) (1988).]

The jury responded "yes" to each of these inquiries, thus indicating that it found each of the aggravating circumstances to exist.

The following aggravating circumstance was submitted to the jury with regard to the murder of Mrs. Margaret Davis:

(1) Was the murder of Margaret Davis part of a course of conduct in which the Defendant engaged and did that course of conduct include the commission by the Defendant of other crimes of violence against another person or persons? [N.C.G.S. § 15A-2000(e)(11).]

The jury answered "yes" to this inquiry as well, indicating that it found the existence of this aggravating circumstance.

After a review of the record, transcripts, briefs, and oral argument of counsel, we conclude that the evidence supports the jury's finding of each of these aggravating circumstances. In addition, we conclude that the sentence of death was not imposed by the jury while under the influence of passion, prejudice, or any other arbitrary factor. Accordingly, we undertake our final task in the review of the sentence imposed, and that is to engage in a review of the proportionality of the sentence. *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).

"In conducting proportionality review, '[we] determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant.' " *State v. McHone*, 334 N.C. 627, 646, 435 S.E.2d 296, 307 (1993) (quoting *Brown*, 315 N.C. 40, 70, 337 S.E.2d 808, 829), *cert. denied*, --- U.S. ---, 128 L. Ed. 2d 220 (1994).

STATE v. INGLE

[336 N.C. 617 (1994)]

"The purpose of [proportionality] review is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In so doing, proportionality review serves as "a check against the capricious or random imposition of the death penalty." *Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544.

This Court has thus far determined the sentence of death to be disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

In only two of those cases, *State v. Rogers* and *State v. Bondurant*, did the jury find that the murder was committed as part of a course of conduct including the commission of other crimes of violence against others, the aggravating circumstance found for the murders of both Mr. and Mrs. Davis. *Rogers*, 316 N.C. at 234, 341 S.E.2d at 731; *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170.

In *Rogers*, the event upon which the aggravating circumstance was based was the firing of a pistol at the victim's companion in the moments immediately following the shooting of the victim. These facts stand in stark contrast to the accompanying crimes of violence in the present case; we perceive a marked and significant difference between the consecutive bludgeoning of two elderly persons in their home and the firing of a pistol at a man standing outside of a nightclub, as was the case in *Rogers*. In addition, the facts surrounding the murder in *Rogers* militate against a comparison between the two cases. In that case, there was evidence of previous ill will including physical threats between one of the defendants and the victim's companion. There was testimony that the victim had been carrying a weapon of his own a few hours prior to the killing and that he had been " 'acting wild.' " *Rogers*, 316 N.C. at 212, 341 S.E.2d at 719. Finally, the defendants' testimony in *Rogers* was that the victim had fired the first shot.

**STATE v. INGLE**

[336 N.C. 617 (1994)]

In *State v. Bondurant*, the defendant inexplicably shot his friend in the head with a pistol after taunting the victim, saying, " 'You don't believe I'll shoot you, do you?' " *Bondurant*, 309 N.C. at 677, 309 S.E.2d at 173. Immediately after shooting the victim, however, defendant directed that the victim be taken to the hospital and accompanied him there. While at the hospital, defendant spoke with police officers about the incident. In *Bondurant*, we held that the sentence of death did " 'not rise to the level of those murders in which we have approved the death sentence upon proportionality review.' " *Id.* at 693, 309 S.E.2d at 182 (quoting *State v. Jackson*, 309 N.C. at 46, 305 S.E.2d at 717). We noted that defendant did not kill the victim in the perpetration of another felony, that he did not coldly calculate the commission of the crime for a long period of time, and that it was not a torturous murder. *Id.* In addition, we found it important that "immediately after he shot the victim, [defendant] exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. The aspect of the case that supported the finding of the aggravating circumstance was apparently the fact that after shooting the victim, Bondurant "pointed the gun at [a witness] for 'two or three minutes' and asked him what he would say when they got to the hospital." *Id.* at 677, 309 S.E.2d at 173.

It is thus clear that these cases involve entirely different sorts of killings. It is fair and easy to say that the brutal and apparently unprovoked beating to death of the Davises reflects a far more egregious set of circumstances than those present in *Rogers* and *Bondurant*, or in any of the cases in which this Court has held the death penalty to be disproportionate. We find no noteworthy similarities between those cases and the present case that are advantageous to defendant.

Defendant contends that the sentence of death should be set aside because his victims were taken completely by surprise and were killed instantly. Even if we were to subscribe to the truth of this disputed assertion, when considered with the undisputed facts of this case, we find it an insufficient basis upon which to conclude that the sentence of death is disproportionate.

Defendant further contends that the sentence of death is disproportionate because of the substantial evidence of his insanity at the time of the murders. We do not adhere to the point of

STATE v. INGLE

[336 N.C. 617 (1994)]

view taken by defendant on this point. The jury specifically rejected the four statutory mitigating circumstances submitted to it: that "Defendant has no significant history of prior criminal activity," *see* N.C.G.S. § 15A-2000(f)(1) (1988); that the "murder was committed while the [D]efendant was under the influence of mental or emotional disturbance," *see* N.C.G.S. § 15A-2000(f)(2) (1988); that "the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," *see* N.C.G.S. § 15A-2000(f)(6) (1988); and the catchall circumstance, *see* N.C.G.S. § 15A-2000(f)(9) (1988). Of the remaining ten nonstatutory mitigating circumstances submitted, the jury found the existence of six.[1]

Simply put, the facts show a brutal murder of an elderly couple committed without provocation and for no apparent motive other than defendant's pleasure in committing the crimes. There is nothing about this case, including defendant's troubled upbringing, that leads us to the conclusion that the sentence of death is dispropor-

---

1. The jury found the following nonstatutory mitigating circumstances with regard to the killing of William Fred Davis:

(6) Whether Phillip Ingle confessed to law enforcement officers that he killed Margaret and Fred Davis?

. . . .

(7) Whether Phillip Ingle as a child saw his mother try to kill herself on at least one occassion [sic] by cutting her wrist?

. . . .

(8) Whether Phillip Ingle as a child saw his mother overdose on drugs on at least one occassion [sic]?

. . . .

(9) Whether Phillip Ingle as a child tried to hang himself on at least one occassion [sic]?

. . . .

(10) Whether Phillip Ingle as a young man attempted to commit suicide by shooting himself?

. . . .

(12) Whether Phillip Ingle has two daughters ages 9 and 2?

The jury found the same mitigating circumstances to exist with regard to the killing of Margaret Davis.

tionate. We have affirmed the death penalty in many cases where the defendant's background consisted of similar hardship. *See State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308 (evidence of severe and traumatic experiences as a child; grandfather committed suicide in his presence; indications of cocaine-induced psychosis), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983); *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (parents were violent and constantly drunk, beat their children frequently; evidence that defendant had a mental disorder and unstable personality as a result of experiences during formative years).

The facts of this case speak for themselves: Defendant crept into the victims' home and suddenly engaged in an incomprehensible, savage, and senseless bludgeoning with an axe handle. After he had beaten Mrs. Davis, defendant moved to the next room and similarly beat Mr. Davis to death. Upon the completion of these tasks, defendant discarded the axe handle and attempted to dispose of other items taken from the home. He later announced his deeds to an acquaintance and offered to "take care of" a troublesome neighbor and "kill his whole family."

The jury refused to attribute defendant's actions to an inability to appreciate the nature and quality of his actions at the time of the killings. The jury likewise declined to find as mitigation that defendant suffered from mental disturbance at the time of the killings. We hold that the sentence of death in this case is not disproportionate and decline to set aside the death penalty imposed.

In summary, we have carefully reviewed the transcript of this trial and sentencing proceeding as well as the record, briefs, and oral arguments of counsel. We have addressed all of defendant's assignments of error and conclude that defendant received a fair trial and capital sentencing proceeding free from prejudicial error. The convictions and the aggravating circumstances are supported by the evidence. The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and is not disproportionate.

NO ERROR.