STATE OF NORTH CAROLINA v. JERRY WAYNE MIZE

No. 97A85

(Filed 10 December 1985)

1. Homicide § 7— directed verdict of not guilty by reason of insanity denied—no error

The trial court did not err in a prosecution for first degree murder by not directing a verdict of not guilty by reason of insanity where defendant presented strong evidence that he suffered from a serious mental disorder, but the State produced evidence of defendant's sanity in that an S.B.I. special agent testified that defendant understood his questions and responded in complete sentences less than four hours after the slaying; defendant reviewed his statement with the agent and read it aloud to the agent as they checked for errors; Broughton Hospital records included a report that defendant was neat and attentive, knew who he was and where he was, had good insight and a good ability to interpret things, and that there was no evidence of psychotic thought process or defective disorder; defendant had obtained a driver's license and had gone to the office of a federal district court judge a few days prior to this incident to get advice on bringing an action against the sheriff's department for a violation of his civil rights; and defendant stated that basically the murder was a result of his anger about being put in jail and anger over the victim's homosexual remarks towards him.

2. Criminal Law § 112.6— murder—evidence of insanity—jury instructed to consider only after determination of guilt—no error

The trial court did not err in a prosecution for murder by instructing the jury to consider evidence of defendant's insanity only if it found that the State had proved beyond a reasonable doubt all the elements of the crimes submitted to it. Defendant was not entitled to an affirmative instruction that in determining whether or not the defendant acted with premeditated and deliberated malice the jury must consider his mental condition.

3. Criminal Law § 5.1— murder—burden of proof on insanity placed on defendant—State not unconstitutionally relieved of burden of proof

The State is not unconstitutionally relieved of its burden of proof in a prosecution for murder by placing the burden of proof on the issue of insanity on the defendant; the trial court properly instructed the jury that in order to convict defendant of first degree murder the State must have shown beyond a reasonable doubt that the slaying was committed intentionally and with premeditation, deliberation and malice.

4. Criminal Law § 63.1— murder—insanity—defendant's hospital records—door opened by defendant

The trial court did not err in a prosecution for murder at which defendant claimed insanity by admitting into evidence the contents of a report by a doctor at Broughton Hospital who did not testify at trial. A doctor who testified for defendant stated on direct examination that he relied on information from several sources, including all of defendant's records at Broughton Hospital.

The specific use of the Broughton records on direct examination opened the door for the State's use of the report on cross-examination; furthermore, N.C.G.S. 8C-1, Rule 705, gives the opposing party the right to require disclosure of the underlying facts or data of an expert's opinion prior to his testimony and on cross-examination. N.C.G.S. § 8C-1, Rule 703.

Justice MARTIN concurring.

Justice FRYE joins in the concurring opinion.

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from the judgment entered by *Owens, J.*, at the 22 October 1984 Criminal Session of Superior Court, RUTHERFORD County. Heard in the Supreme Court 14 October 1985.

Defendant was charged in an indictment, proper in form, with first degree murder. The district attorney did not seek the death penalty because of the absence of any aggravating circumstance.

At trial, the State's evidence tended to show that defendant was jailed on 17 August 1984 on trespassing charges instigated by his mother. Defendant was placed in the "three man south" cell of the Rutherford County Jail. This cell contains three separate sleeping compartments and a large common area called the "run-around." Each sleeping cell has a lavatory and commode of its own. On 18 August 1984, defendant occupied this cell with Charles Barnes and George Parsons.

John Oliver, the Rutherford County Jail trustee, testified that at approximately 7:00 p.m. on the evening of 18 August 1984 defendant called him back to his cell. When Oliver arrived at the cell, he saw defendant standing in the run-around and holding a large pipe, two feet long and four inches in diameter, wrapped in a towel. Oliver immediately asked defendant for the pipe. Defendant replied, "No, I just killed that son-of-bitch with it," and pointed towards Charles Barnes who appeared to be sleeping in the bed in his own compartment. Oliver called out to Barnes but received no response.

By this time, the jailer, Mike Wallace, had come back to defendant's cell. He ordered defendant to hand him the pipe and called Charles Barnes's name several times. When Barnes failed to answer, Wallace went to find the magistrate. While Wallace

was gone, Oliver convinced defendant to set the pipe on the floor by the cell door.

Wallace thereafter returned with the magistrate and ordered defendant to go back into his sleeping cell. Defendant complied. Wallace then unlocked the cell door and went over to Barnes. Wallace testified that he shook Barnes and spotted blood oozing out of Barnes's right ear and the front of his face. Wallace instructed the magistrate to call for an ambulance. Dr. Michael Wheeler testified at trial that Barnes died from being struck with a blunt object causing skull fractures which extensively damaged the right portion of his brain.

Later that same evening around 10:20 p.m., defendant gave a statement to SBI Special Agent Bruce Jarvis admitting that he had killed Barnes. Defendant stated that two weeks prior to this occasion he had been jailed with Barnes and that they had fought. During their latest incarceration together, Barnes had threatened defendant with a razor blade. Because of these incidents, defendant was afraid of Barnes.

Defendant further explained in this statement that he built a fire underneath some sewer pipes that ran along the wall of his sleeping cell in order to melt the lead surrounding the pipes. The fire sufficiently loosened the pipes to enable him to pull one of them from the wall. He stated that he wrapped a towel around one end of the pipe and used an orange band he tore from the towel to tie it onto the pipe. He then laid the pipe at the end of his bed and smoked two cigarettes while deciding whether or not to kill Barnes. When defendant had decided that he did want to kill Barnes, he picked up the pipe, went into Barnes's cell while he was asleep, and hit him three times with the pipe on the right side of his head.

Agent Jarvis further testified that during the interview defendant understood his questions and responded in complete sentences. After his statement had been reduced to writing, defendant, in checking for errors, read the statement out loud to Jarvis.

In his defense, defendant offered considerable evidence of his insanity at the time of the incident. His mother, Rosalee Mize, testified that she had him committed to the mental facilities at

Broughton Hospital for the first time in 1979. Defendant was released after a few weeks when it was determined that he was not a danger to himself or to others. He was readmitted to Broughton four times in 1981. The last time he was admitted to Broughton was in mid-July 1984, approximately a month before the Barnes killing. Mrs. Mize testified that she received a telephone call from Broughton Hospital officials concerning whether she had any insurance coverage for defendant or whether he had a source of income. When she replied no to both inquiries, the hospital officials informed her that defendant would be released and sent home.

Mrs. Mize further testified that several days prior to the incident in the Rutherford County Jail she returned home from work and found that defendant who lived with her had taken her belongings, including her clothes, pictures, mirrors, and the family Bible, out of her house and put them in the yard. The next day she observed him in her front yard digging graves for his daughter who had died from crib death eight years earlier and for his brother who had been dead two years. Mrs. Mize again attempted to have defendant committed and returned to Broughton for help. She stated at trial that after talking with a magistrate she took out a warrant against the defendant for trespassing so that he would be placed in jail over the weekend until she could talk to the doctor at Broughton on Monday about admitting defendant.

Defendant, testifying on his own behalf, stated that while he was in jail on the trespassing charges the victim, Charles Barnes, made several homosexual overtures toward him. Defendant related that several years earlier while in jail on other charges, he had been gang-raped by three men. Defendant testified that although Barnes had not yet sexually assaulted him he was afraid of him and what he might do. Defendant admitted that before he realized it he had the pipe in his hand and had struck Barnes on the head with it. State's witnesses, Magistrate Samuel Lee Ramsey and SBI Agent Bruce Jarvis, testified in corroboration of defendant's testimony that on the night of the incident he was afraid of Barnes's homosexual advances.

Defendant offered other evidence of his insanity, including the testimony of Dr. Bob Rollins, a forensic psychiatrist at Dorothea Dix Hospital. He examined and interviewed defendant

from 20 August to 3 September 1984 and from 4 September to 7 October 1984. In making his diagnosis, Dr. Rollins talked with others who knew defendant and reviewed all of his records from Broughton Hospital. Dr. Rollins concluded that defendant was primarily suffering from a schizo-affective disorder with a secondary diagnosis of an anti-social personality trait. In Dr. Rollins's opinion, defendant was incapable of distinguishing right from wrong on 18 August 1984.

The jury returned a verdict of guilty of first degree murder. The trial court sentenced the defendant to life imprisonment.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

BRANCH, Chief Justice.

[1] By his first assignment of error, defendant contends that the trial court erred in failing to direct a verdict of not guilty by reason of insanity. Basically, defendant argues that his evidence of insanity was uncontroverted and so overwhelming that he was entitled to have the issue of his guilt not submitted to the jury. We do not agree, however, that his evidence was uncontroverted.

The test of insanity as a defense to a criminal charge in this State is the capacity to distinguish between right and wrong at the time of and in respect to the matter under investigation. *State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976). When the defense of insanity is interposed, certain principles and presumptions apply. In this jurisdiction, every person is presumed sane until the contrary is shown. This presumption of sanity gives rise to the firmly established rule that the defendant has the burden of proving that he was insane during the commission of the crime. *State v. Swink*, 229 N.C. 123, 47 S.E. 2d 852 (1948). The defendant, however, unlike the State, which must prove his guilt beyond a reasonable doubt, is merely required to prove his insanity to the satisfaction of the jury. *State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975).

At trial, defendant made a motion for nonsuit at the close of the State's evidence and again at the close of all the evidence.

The motion to dismiss at the close of the State's evidence was waived when defendant elected to offer evidence. *State v. Hough*, 299 N.C. 245, 262 S.E. 2d 268 (1980). Although defendant did not categorize his request of the court as a motion for a directed verdict, it is well settled that the two motions have the same effect. *State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975). On a motion for judgment of nonsuit or a motion for a directed verdict of not guilty, "the evidence for the State is taken to be true, conflicts and discrepancies therein are resolved in the State's favor and it is entitled to every reasonable inference which may be drawn from the evidence." *Id.* at 568, 213 S.E. 2d at 318. "All of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is considered by the Court in ruling upon the motion." *State v. McKinney*, 288 N.C. 113, 117, 215 S.E. 2d 578, 581-82 (1975).

This Court has previously been faced with the question of whether the trial court erred in refusing to direct a verdict of not guilty by reason of insanity. *See State v. Leonard*, 300 N.C. 223, 266 S.E. 2d 631, *cert. denied*, 449 U.S. 960, 66 L.Ed. 2d 227, 101 S.Ct. 372 (1980); *State v. Harris*, 290 N.C. 718, 228 S.E. 2d 424 (1976), *overruled on other grounds*, *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645 (1983); *State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976); and *State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975).

The rule applied in *Harris, Hammonds*, and *Cooper* provided that "in all cases there is a presumption of sanity, and when there is other evidence to support this presumption, this is sufficient to rebut defendant's evidence of insanity on a motion for nonsuit or for a directed verdict." *Harris*, 290 N.C. at 726, 228 S.E. 2d at 430. *See also Hammonds*, 290 N.C. at 7, 224 S.E. 2d at 599, and *Cooper*, 286 N.C. at 570, 213 S.E. 2d at 319. In *Hammonds*, the defendant shot a storeowner over his month-old accusation that the defendant had stolen some pepper from his store. Dr. Rollins from Dorothea Dix Hospital and another privately retained psychiatrist testified that the defendant could not distinguish right from wrong. Two police officers, however, stated that the defendant appeared and acted normal immediately after the shooting. The testimony of the police officers, coupled with the presumption of sanity, was held sufficient evidence to have the case submitted to the jury. *Id.* at 7, 224 S.E. 2d at 599.

In *Harris*, the defendant shot and killed four women who were involved in a lye-throwing incident months earlier that had severely injured the defendant. Two experts in the fields of psychology and psychiatry stated that, although they had no opinion as to whether the defendant could distinguish right from wrong, the defendant did not understand the nature and quality of his acts on the day of the shootings. The husband of one of the victims testified that prior to the murder of his wife the defendant acted friendly. The arresting officer added that the defendant did not give the police any trouble when apprehended. There was also no evidence that the defendant acted abnormally immediately after the commission of the crimes. We held that this evidence of sanity, when combined with the presumption of sanity, was sufficient to overcome the defendant's motion for a directed verdict. *Id.* at 726-27, 228 S.E. 2d at 430.

In *Cooper*, the defendant killed his wife and four of their five children (ages 7 months to 6 years) because he thought that they were from outer space and were trying to kill him. The brutality of the slayings, the defendant's fantastic motive for his actions, and expert testimony that due to his mental illness the defendant could not apply his knowledge of right and wrong appeared to be overwhelming evidence of his insanity. This Court held, however, that the defendant's motion for a directed verdict of not guilty by reason of insanity was properly denied. The State presented evidence that in the opinion of the attending physician, the nurse, the hospital attendant, all of whom observed the defendant within 24 hours of the murders, and the State's psychiatric expert, the defendant was in his right mind and could distinguish right from wrong. *Id.* at 569-70, 213 S.E. 2d at 319. Their testimony constituted sufficient evidence of sanity to require submission of the case to the jury.

The evidence offered at trial in the present case is similar to that admitted in the foregoing cases. Defendant presented strong evidence that he suffered from a serious mental disorder. He offered as witnesses his relatives, members of his community, and two psychiatric experts who testified that he had been admitted to mental hospitals numerous times, continuously exhibited bizarre behavior, and could not distinguish right from wrong.

Nevertheless, the record also reveals that the State did produce some evidence of the defendant's sanity. Bruce Jarvis, a special agent with the SBI, testified that less than four hours after the slaying defendant understood his questions and responded in complete sentences. He also related that defendant reviewed his statement and read it aloud to Jarvis as they checked for errors.

One of defendant's psychiatric experts, Dr. Rollins, stated on direct examination that in making his diagnosis he reviewed all of defendant's Broughton Hospital records. On cross-examination it was brought out that these records included a report by Dr. Norman Boyer, a Broughton psychiatrist, concerning his observations of defendant on 15 July 1984. According to Boyer's report, defendant was neat and attentive, knew who he was and where he was, and had good insight and a good ability to interpret things. In Dr. Boyer's opinion, there was "no evidence of psychotic thought process or defective disorder." Defendant was released from Broughton with no follow-up care arranged or medication prescribed.

Defendant on cross-examination further revealed that he had obtained a driver's license, and that several days prior to this incident he had gone to the office of a federal district court judge to get advice on bringing an action against the sheriff's department for a violation of his civil rights. Moreover, defendant stated that basically the murder was a result of his anger about being put in jail and over Barnes's homosexual remarks towards him. We hold this evidence coupled with the presumption of sanity was sufficient to have the case submitted to the jury. Therefore, defendant's motion to dismiss at the close of all the evidence was properly denied.

[2] Defendant's second assignment of error challenges the trial court's instructions to the jury. Defendant contends that by placing the burden of proof on the issue of insanity on the defendant the State's burden of proving every element of the offense beyond a reasonable doubt has been eased in violation of his constitutional right to due process.

Defendant specifically attacks the portion of the trial court's charge which instructs the jury to consider the evidence of defendant's insanity "only if you find that the State has proved

beyond a reasonable doubt each of the things about which I have already instructed you in connection with first degree murder, second degree murder and voluntary manslaughter." Defendant asserts that this instruction effectively lessened the prosecution's burden of proving premeditation, deliberation, and malice by essentially directing the jury to disregard his insanity evidence even though it might have some effect on the jury's determination of these elements.

Essentially, this instruction directs the jury to first determine whether the State has proved beyond a reasonable doubt all the elements of the crimes submitted to it before it considers the insanity issue. This instruction merely reflects the order of the issues which would be submitted to the jury as approved by this Court in *State v. Linville*, 300 N.C. 135, 265 S.E. 2d 150 (1980), and *State v. Boone*, 302 N.C. 561, 276 S.E. 2d 354 (1981). The reasoning behind these decisions is "that the jury should establish defendant's guilt or innocence of the crime first and reach the insanity issue only if it first found defendant guilty of the crime." *Id.* at 568, 276 S.E. 2d at 359. This Court has previously held that the defendant is not entitled to an affirmative instruction that in determining whether or not the defendant acted with premeditated and deliberated malice the jury must consider his mental condition. *See Harris*, 290 N.C. at 724, 228 S.E. 2d at 429; *Hammonds*, 290 N.C. at 10-11, 224 S.E. 2d at 600-01; *Cooper*, 286 N.C. at 572-73, 213 S.E. 2d at 320-21. We also note that the trial judge clearly stated throughout his instructions that with regard to first degree murder the State had to prove premeditation, deliberation, and malice beyond a reasonable doubt. We hold that defendant's argument is without merit and that this portion of the charge was free from error.

[3] In a similar sense, defendant also argues that assigning him the burden of proof on the issue of insanity relieves the State of its duty of establishing that the act was committed with the requisite *mens rea*. This contention must likewise be rejected. *See generally Hammonds*, 290 N.C. at 7-11, 224 S.E. 2d at 599-601. The *mens rea* or the criminal intent required for first degree murder is proven through the elements of premeditation and deliberation. *Cooper*, 286 N.C. at 572, 213 S.E. 2d at 320. The trial court in this case properly instructed the jury that in order to convict defendant of first degree murder the State must have shown beyond a

reasonable doubt that the slaying was committed intentionally and with premeditation, deliberation and malice. We hold that the State is not unconstitutionally relieved of any burden by the rule placing the burden of proof on the issue of insanity on defendant.

We recognize that all of defendant's arguments concerning the trial court's instructions essentially ask us to again question the propriety of placing the burden of proof of insanity on defendant. We reconsidered this issue in *State v. Heptinstall,* 309 N.C. 231, 306 S.E. 2d 109 (1983), and refused to change our rule. Defendant's present arguments have failed to convince us that the rule should be changed at this time.

**[4]** Defendant's final assignment of error contests the admission into evidence of the contents of a report by Dr. Norman Boyer who did not testify at trial. The substance of the Boyer report was revealed to the jury during the State's cross-examination of Dr. Bob Rollins. The report stated that when defendant was examined at Broughton in July of 1984 he was neat, oriented, and cooperative and that there was no evidence that he was suffering from a psychotic thought process or defective disorder. Although the report was never formally introduced into evidence, the trial court summarized the contents of the report to the jury in its instructions. Defendant failed to object to the State's use of the report during its cross-examination of Dr. Rollins. He now argues, however, that the admission of the report was in violation of his right of confrontation and constituted plain error.

In support of his contention, defendant relies upon *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, 103 S.Ct. 3552 (1983). In *Taylor*, the same method of cross-examination was permitted by the trial court during the penalty phase of the defendant's trial. The district attorney was allowed to cross-examine the defendant's psychiatrist using a psychiatric evaluation prepared by a second psychiatrist not called as a witness. This Court expressly disapproved of this procedure, stating it was "improper for the simple reason that it allowed the State to get [the second psychiatrist's] testimony before the jury at the same time it cross-examined [the defendant's psychiatrist]." *Id*. at 281, 283 S.E. 2d at 781. We held, however, that this improper admission of evidence was cured when substantially the same evidence was admitted on redirect examination by the defendant.

We believe that the present situation is distinguishable from *Taylor*. On direct examination, Dr. Rollins testified that in making his diagnosis and in forming his opinion as to defendant's mental condition, he relied on information from several sources, including "all of the records at Broughton Hospital." Dr. Boyer was a staff psychiatrist at Broughton and the report in question was a part of the Broughton records. Dr. Rollins was allowed, over the State's objection, to read directly from the Broughton records which catalogued defendant's conduct during his hospital stays prior to and including his July 1984 visit, the subject of the Boyer report used by the State on cross-examination.

Consequently, the specific use of the Broughton records on direct examination opened the door for the State's use of the Broughton-Boyer report on cross-examination. Before inquiring into the actual findings of the report, the State asked Dr. Rollins if he had a copy of the Boyer-July 1984 report, if he knew Dr. Boyer and his signature, and if he relied on this report in forming his opinion. To all of these questions, Dr. Rollins replied affirmatively. In contrast, the testifying psychiatric expert in *Taylor* had not used the report of the second doctor in making his evaluation of the defendant and therefore the reference to the report by the State was a new matter brought out on cross-examination.

Furthermore, this case was tried after the North Carolina Evidence Code became effective. N.C. Gen. Stat. § 8C-1, *et seq*. N.C.G.S. § 8C-1, Rule 703, allows an expert to base his opinion testimony on "facts or data . . . perceived by or made known to him at or before the hearing [which] . . . need not be admissible in evidence." N.C.G.S. § 8C-1, Rule 705, gives the opposing party the right to require disclosure of the underlying facts or data of the expert's opinion prior to his testimony and on cross-examination. We hold, therefore, that the discussion of the Boyer report on cross-examination was proper. Defendant's contention that the admission of this evidence constituted plain error is without merit.

For the reasons stated above, we find defendant received a fair trial, free from prejudicial error.

No error.

Justice MARTIN concurring.

I concur wholeheartedly with the majority opinion. I write only to state that had the defendant requested that the jury be instructed to consider the evidence of defendant's mental condition in connection with his ability to form the specific intent to kill, I would vote to hold it error to fail to so instruct. My opinion is based upon the scholarly and accurate dissent of Justice (later Chief Justice) Sharp in *State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975). Here, defendant made no such motion; therefore I concur in the majority opinion.

Justice FRYE joins in this concurring opinion.