**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN THOMAS NOLAND, JR.,
Petitioner-Appellee,

v.

No. 97-10

JAMES B. FRENCH, Warden, Central
Prison, Raleigh, North Carolina,
Respondent-Appellant.

JOHN THOMAS NOLAND, JR.,
Petitioner-Appellant,

v.

No. 97-11

JAMES B. FRENCH, Warden, Central
Prison, Raleigh, North Carolina,
Respondent-Appellee.

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, District Judge.
(CA-88-217-3-MU)

Argued: October 28, 1997

Decided: January 7, 1998

Before ERVIN, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Ervin wrote the opinion, in which Judge Hamilton and Judge Luttig
joined.

_____

**COUNSEL**

**ARGUED:** Barry Steven McNeill, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant. James Patrick Cooney, III, KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina, for Appellee. **ON BRIEF:** Michael F. Easley, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant.

_____

**OPINION**

ERVIN, Circuit Judge:

John Thomas Noland filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1994). The district court granted Noland's petition with regard to his sentence, ordering the State of North Carolina to conduct a new sentencing hearing. It ruled that the jury was improperly instructed at the sentencing phase of Noland's trial as to its consideration of mitigating circumstances, in violation of McKoy v. North Carolina, 494 U.S. 433 (1990). The district court rejected all of Noland's other claims for relief. The state appeals the issuance of the writ as to Noland's sentence and Noland cross-appeals on four issues rejected by the district court that involve both the guilt-innocence and penalty phases of his trial. Because we believe the district court wrongly decided the McKoy issue, the writ should have been denied and we therefore reverse in part and affirm in part.

I.

Noland and Susan Milton Noland were married for nine years prior to their separation on March 3, 1981. The couple had two daughters and resided in Charlotte, North Carolina for the last eight years of their marriage. In the weeks immediately after their separation, Noland visited Susan and his daughters at least once a week and talked on the phone with them frequently. Noland constantly begged Susan to return to him. Later, he began making threats regarding their property.

During this time, Noland's parents arranged for him to receive psychiatric treatment. A staff psychiatrist at the Mecklenburg Mental Health Center, Dr. Reback, evaluated Noland in April 1981 and recommended partial hospitalization at the Center. By May 1981, Dr. Reback was of the opinion that Noland was mentally ill and dangerous, and needed full, in-patient hospitalization. On May 21, 1981, a North Carolina state court ordered Noland committed to a state hospital, finding him to be "mentally ill and dangerous to himself" by clear and convincing evidence. The record does not indicate when Noland was released from the hospital.

In June 1981, Susan moved with the children to California to live with her older sister. She informed Noland by letter where she and the children were living. For the next several months, Noland maintained ongoing telephone contact with them. After approximately four months, Susan and the children moved again but did not give Noland the new address or phone number. She maintained periodic contact with Noland through her sister's telephone.

Every time Susan and Noland talked by phone, he asked her when she was coming back to Charlotte. She always replied that she did not know. In November 1981, Noland began making threats against Susan's family. Noland told her that he would kill her father, mother, and sister if she did not return to Charlotte with the children before Christmas. He said, "I'm going to kill Cindy[Susan's sister] first because she means more to you than anything. I'm going to kill your daddy and make your momma watch." Noland further specified that he would place a "gun between your daddy's eyes and blow his head off." Susan and the children did not return to Charlotte.

On February 5, 1982, Noland telephoned Susan and told her that he would kill her family if she did not return to Charlotte within two weeks. The following day, Noland called again and demanded her decision immediately. When Susan answered that she did not want to take the children out of school, Noland responded,"Well, you will come back; you'll have to come back, because I am going to kill your family."

On the evening of February 21, 1982, Cindy Milton (Susan's sister), was watching television with two friends in the living room of

3

her home in Charlotte. This house was the same one that had previously been occupied by Noland and Susan. Noland entered the house through the back door and chased Cindy into the laundry room yelling, "I told you not to get involved." As Cindy huddled behind the laundry room door, Noland shot Cindy in the back of the head, killing her.

Directly across a vacant lot from Cindy's house lived her parents, Mary and Troy Milton. Noland left Cindy's house and walked across the street to her parents' home. Noland entered a bedroom and shot Troy Milton in the face while he slept, killing him. Noland pushed the door to a second bedroom open and told Mary Milton,"I told you I was going to kill all three of you. And, I've already killed Cindy and your old man. I'm going to get you." Mary lunged at Noland with a bar stool as he shot her at pointblank range, inflicting a nonlethal wound. She fell to the floor and remained very still. After Noland left, Mary phoned Cindy's house and discovered from her guests that Cindy had been shot; Mary then called the Charlotte Police Department.

Charlotte police officers found Noland within one hour after the shootings. He was taken to the police department and properly advised of his Miranda rights. Noland invoked his right to have an attorney present during any further questioning by the officers. Later that night, Noland made the following unsolicited and voluntary comment to a police officer: "Man, I just killed two people, man. Why are you being so nice to me?"

In October 1982, a jury found Noland guilty of first degree murder in the deaths of Cindy and Troy Milton. The jury also returned sentences of death for both murders. The judgments were affirmed by the North Carolina Supreme Court. State v. Noland , 320 S.E.2d 642 (N.C. 1984), cert. denied, 469 U.S. 1230 (1985). Noland sought state collateral relief by filing a motion for appropriate relief in Mecklenburg County Superior Court. Following an evidentiary hearing, the court denied relief. Noland's petition for a writ of certiorari to the North Carolina Supreme Court was denied. State v. Noland, 361 S.E.2d 85 (N.C. 1987), cert. denied, 485 U.S. 943 (1988).

In August 1988, Noland filed a petition for writ of habeas corpus in the U.S. District Court for the Western District of North Carolina.

4

The district court conditionally granted the writ as to both convictions and sentences. Noland v. Dixon, 831 F. Supp. 490 (W.D.N.C. 1993). We vacated this judgment on the ground that the district court erred in not allowing the state to amend its pleadings to raise Teague as an affirmative defense to all of Noland's claims. Noland v. Dixon, 53 F.3d 328, 1995 WL 253149 (4th Cir. May 1, 1995) (unpublished opinion). We remanded the case to the district court with instructions "to allow the state to amend its answer to raise Teague as an affirmative defense to all of Noland's claims, and address the claims raised by Noland in his petition on a clean slate." Id. at *3.

On remand, the district court ruled on nine issues, five of which are relevant to this appeal. First, the district court ruled in favor of Noland on his claim that the jury instructions in the sentencing phase impaired the jury's ability to consider mitigating factors in violation of McKoy v. North Carolina, 494 U.S. 433 (1990). On four other claims, the district court denied Noland's petition: 1) that the jury instructions on insanity violated due process by relieving the State of its burden to prove the element of mens rea for murder beyond a reasonable doubt; 2) that the State used evidence of Noland's invocation of his Miranda rights to rebut his defense of insanity; 3) that Noland's counsel was ineffective at both the guilt-innocence and penalty phases of his trial; and 4) that Noland was incompetent to stand trial. On the basis of the McKoy violation, the district court issued the writ as to Noland's sentence, ordering the State to resentence him. The parties cross-appeal the district court's decisions on these five issues and we consider them seriatim.

II.

As a preliminary matter, we must address the State's argument regarding the appropriate standard of review for this case. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, was signed into law on April 24, 1996 and amended 28 U.S.C. § 2254 to change the standard by which we review the habeas petition of a person in custody pursuant to the judgment of a state court. Under pre-AEDPA law, we review a state court's determinations of questions of law and mixed questions of law and fact de novo. Howard v. Moore, No. 95-4017, slip op. at 8 (4th Cir. Dec. 9, 1997) (en banc); Savino v. Murray, 82 F.3d 593, 598 (4th Cir. 1996),

5

cert. denied, 117 S. Ct. 1. Under § 2254 as amended by the AEDPA, the reviewing court cannot grant the writ unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 110 Stat. 1214, 1219, 28 U.S.C.A. § 2254(d)(1) (West Supp. 1997). The parties briefed the issue of whether this new standard of review should be retroactively applied to petitions pending in the federal courts prior to passage of the AEDPA.

After the parties filed their briefs, the Supreme Court decided Lindh v. Murphy, 117 S. Ct. 2059 (1997), holding that the amendments to Chapter 153 of Title 28, of which the new standard of review is a part, should not be applied to cases pending at the time the AEDPA took effect. At oral argument in the instant case, counsel for the State did not waive its argument that the new standard of review should apply, distinguishing Lindh as a non-capital case. Nothing in Lindh supports such an argument and this court has already held that Lindh requires us to use the pre-AEDPA standard of review in a capital case pending in federal court at the time the AEDPA was signed into law. See Howard, slip op. at 2-3. We therefore review questions of law and mixed questions of law and fact de novo. Any factual findings by the State court are presumed to be correct as long as they were made after a full, fair, and adequate hearing on the merits. See 28 U.S.C.A. § 2254(d) (West 1994) (pre-AEDPA).

III.

In McKoy v. North Carolina, 494 U.S. 433 (1990), the Supreme Court struck down the North Carolina practice that required a capital sentencing jury to find mitigating circumstances unanimously before they could be considered for the purpose of sentencing. The Court held that the unanimity requirement limited the individual juror's consideration of mitigating circumstances and was therefore unconstitutional. Noland claims, and the district court held, that the sentencing instructions at Noland's trial constituted McKoy error. In determining whether the jury instructions violated McKoy in Noland's trial, the question is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consider-

6

ation of constitutionally relevant evidence." <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990).

In this case, the trial court did not give the explicit unanimity instruction on mitigating circumstances that was struck down by the Court in <u>McKoy</u>. The judge instructed the jury to answer four issues in reaching its decision at the penalty phase: 1) whether the jury unanimously found, beyond a reasonable doubt, the existence of the aggravating circumstance; 2) whether the jury unanimously found, beyond a reasonable doubt, that the aggravating circumstance was sufficiently substantial to call for imposition of the death penalty; 3) whether the jury found one or more mitigating circumstances; and 4) whether the jury unanimously found, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances. This portion of the instructions has been held on several occasions by this court not to violate <u>McKoy</u>. <u>See Smith v. Dixon</u>, 14 F.3d 956, 981 n.15 (4th Cir. 1994) (en banc); <u>Lawson v. Dixon</u>, 3 F.3d 743, 754 (4th Cir. 1993); <u>Maynard v. Dixon</u>, 943 F.2d 407, 418-20 (4th Cir. 1991).

In addition to the proper instructions, however, the trial court also gave a general unanimity instruction. The instruction was "general" in the sense that it was not directed to any particular issue or question to be decided by the jury on its verdict form. Just before releasing the jury to begin its deliberations at the penalty phase, the trial court instructed the jury: "After you have reached a <u>unanimous decision as to each issue</u> . . . have your Foreman mark the appropriate place or places on the issues and recommendations forms." <u>J.A.</u> at 1542 (emphasis added). Noland argues that this comment by the trial court created a reasonable likelihood that the jury believed that it must have found any mitigating circumstances unanimously. We disagree.

The trial court's "general unanimity" comment did not occur during its careful explanation of the verdict form, but rather as a supplemental instruction just before the jurors retired to deliberate. The trial court's remark could not reasonably have been understood as a substantive instruction of law since it came after the explanation of the specific and detailed instructions contained on the verdict form. Prior to the general unanimity instruction, the judge read and explained the four issues on the verdict form while each juror followed along with his or her own written copy of the form. It was entirely clear from this

7

portion of the instructions that three of the four issues on the verdict form required juror unanimity while one, the mitigating factor question, did not. The judge's final comment did not create a reasonable probability that the jury would have disregarded the previous clear and precise instructions of the trial court. When read in its proper context, the trial court was merely describing the procedure by which the jury foreman was to record the verdict, and not giving a substantive instruction on the unanimity requirement.

Noland argues that the North Carolina Supreme Court's decision in State v. McNeil, 395 S.E.2d 106 (N.C. 1990), supports the finding of a McKoy violation. In McNeil, the court ruled that general references to jury unanimity could constitute a McKoy violation, even when the court's explicit instructions on mitigating circumstances did not require unanimity. In McNeil, while the verdict form and accompanying instructions contained no express unanimity requirement as to mitigating factors, the trial court made three general references that the verdict required unanimity. See id. at 109 ("[T]he trial court stated at least three times that the jury's answer to all the issues must be unanimous."). The distinction between McNeil and the instant case is obvious. While three general references to unanimity, which contradict the verdict form's silence on unanimity as to mitigating factors, might create a reasonable probability that the jury would assume it needed to find mitigating circumstances unanimously, one such reference in the present context does not.

The explicit substantive instructions and the verdict form made it clear that the jury need not have been unanimous in its determination of mitigating circumstances. The trial court's unanimity comment during its description of how the foreman was to fill out the verdict form does not rise to the level of a McKoy violation, and the district court erred in so holding. Because we find that the judge's comment regarding unanimity does not constitute error under McKoy, we have no reason to consider the other questions regarding this issue, which were briefed by the parties in considerable detail.

IV.

In his cross-appeal, Noland argues that the district court erred in four of its rulings on his habeas petition. We find no merit in Noland's arguments.

8

A.

First, Noland argues that the judge's instructions at the guilt-innocence phase prevented the jury from considering evidence of Noland's mental illness in determining whether he possessed the proper intent for first-degree murder. A jury in North Carolina may consider evidence of mental illness, not only in its decision on the affirmative defense of insanity, but also on the essential element of mens rea. "Under North Carolina law, the existence of mental illness can negate the possibility of intent, deliberation, and premeditation." Cooper v. North Carolina, 702 F.2d 481, 484 (4th Cir. 1983). During jury instructions in the guilt-innocence phase of Noland's trial, the judge informed the jurors that they must find all the essential elements of murder before considering Noland's proffered affirmative defense of insanity.

> You will consider [evidence of insanity] only if you find that the State has proved, beyond a reasonable doubt, each of the offenses, each of the elements of the offenses of murder or second-degree murder.
>
> That is to say, you will consider this evidence only after you have considered and deliberated and reached a verdict of guilty in one of the charges . . . .
>
> After or if you have reach[ed] that verdict, then you will consider evidence with regard to the mental state of the defendant.

J.A. at 326.

Noland's argument that this instruction constitutes error relies on our decision in Cooper v. North Carolina, 702 F.2d 481, 484 (4th Cir. 1983). In Cooper, a habeas petitioner argued that the judge's failure "specifically to instruct the jury that it should consider mental illness evidence in connection with the state's proof of specific intent, premeditation, and deliberation, . . . put the burden on him of demonstrating, through the insanity defense, the absence of intent." Id. at 484. Cooper rejected the argument that failure to include the prof-

9

fered instruction misled the jury into thinking that it could consider mental illness evidence with respect to a defense of insanity "only in that regard," and not with respect to intent, premeditation, and deliberation. Id. at 485.

Noland argues that, unlike Cooper, this is a case in which the jury was explicitly told that it could not consider evidence of mental illness when it was determining his ability to form the requisite intent for first-degree murder. Although Noland attempts to distinguish Cooper on this basis, his argument cannot meaningfully be distinguished from Cooper's claim. Noland, like Cooper, relies on the risk that a jury might not consider relevant evidence based on the judge's instruction that it must decide all the elements of murder before it can consider whether the defendant was legally insane.

This interpretation of these instructions was specifically rejected by the North Carolina Supreme Court in State v. Mize, 337 S.E.2d 562 (N.C. 1985). Mize rejected an argument that these same instructions prohibited a jury from considering evidence of insanity as it related to their deliberations on premeditation, deliberation and malice. The court in Mize reasoned that the instructions at issue "merely reflect[ed] the order of the issues which would be submitted to the jury" and did not direct the jury to disregard evidence of insanity as it related to the elements of premeditation, deliberation, and malice. Id. at 567 (emphasis added). Mize relied on previous decisions which held that a defendant is not entitled to an affirmative instruction that the jury must consider evidence of his mental condition when determining whether the defendant acted with premeditation, deliberation and malice. Id. The court also reasoned that the trial court's clear instructions that the intent elements must be found beyond a reasonable doubt eviscerated any danger that the jury might not consider evidence of insanity when determining these elements. Id.

The district court held that Noland's claim of improper instructions at the guilt-innocence phase was barred by the principles set forth in Teague v. Lane, 489 U.S. 288 (1989), and we agree. Teague holds that "habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure." Teague , 489 U.S. at 316. A case announces a new rule if the outcome "was not dictated by precedent existing at the time the defendant's conviction became final." Id. at

10

301 (emphasis in original); <u>O'Dell v. Netherland</u> , 95 F.3d 1214, 1223-24 (4th Cir. 1996) (en banc) (new rule test is "whether it would have been objectively unreasonable, under the law existing at that time, for a judge to reach a contrary result to that subsequently reached").

Read together, <u>Cooper</u> and <u>Mize</u> demonstrate not only that Noland's claim is not dictated by existing precedent, but that existing precedent is squarely on point <u>against</u> Noland's argument. Contrary to Noland's assertions, <u>Leland v. Oregon</u>, 343 U.S. 790 (1952), and <u>Patterson v. New York</u>, 432 U.S. 197 (1977), do not dictate the resolution of this issue. Those cases decided that states did not violate the Due Process Clause of the Fourteenth Amendment by requiring criminal defendants to prove affirmative defenses. They did not address the question at issue in this case: whether the judge's instructions created a risk that the jury would not consider all relevant evidence in its determination of the essential elements of a crime.

Were we to hold that the instructions at issue deprived Noland of his right to due process, we would create a new rule, which is forbidden by <u>Teague</u>. Neither of the two exceptions to <u>Teague</u>, <u>see Teague</u>, 489 U.S. at 307-10, applies to Noland's claim: this rule would not place certain conduct beyond the power of the law-making authority to proscribe, nor would it constitute a watershed rule of criminal procedure. For these reasons, we find that this claim by Noland is barred by <u>Teague</u>.

B.

Second, Noland claims that the prosecution used his post-arrest invocation of <u>Miranda</u> rights to rebut his affirmative defense of insanity, in violation of <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976), and <u>Wainwright v. Greenfield</u>, 474 U.S. 284 (1986). The district court held that the prosecutor's actions during direct examination of two witnesses and closing argument constituted <u>Greenfield</u> error, but held that this error was harmless. <u>See J.A.</u> at 1350-51. We find no <u>Greenfield</u> error in the first place.

The State twice elicited testimony from police officers that Noland understood his <u>Miranda</u> rights and exercised them. But these comments were in the context of the officers' narratives regarding

11

Noland's apprehension and arrest. Defense counsel did not object at trial, and the prosecutor's questions did not in any way draw attention to Noland's silence or invocation of his right to an attorney. Although no Fourth Circuit case has directly addressed the issue, other circuits have held that mere mention of a defendant's exercise of Miranda rights is not per se prohibited; rather, a Greenfield violation depends on "the particular use to which the post-arrest silence is being put." Lindgren v. Lane, 925 F.2d 198, 202 (7th Cir. 1991); see also Jones v. Stotts, 59 F.3d 143, 146 (10th Cir. 1995) (holding that "it is the prosecutor's exploitation of a defendant's exercise of his right to silence which is prohibited"); United States v. Stubbs, 944 F.2d 828, 835 (11th Cir. 1991) (finding no Greenfield violation "when the government does not specifically and expressly attempt to use . . . the improper comment to impeach the defendant"). Greenfield "does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor." Lindgren, 925 F.2d at 202.

Contrary to Noland's assertion, the prosecutor did not use his closing argument to suggest that Noland's invocation of Miranda rights rebutted evidence of insanity. The prosecutor mentioned Miranda to remind jurors of the timing of the event, but argued that Noland's voluntary statement ("Why are you being so nice to me when I just killed two people?") rebutted his claim that he was unable to appreciate the wrongfulness of his actions. Reading the prosecutor's argument in its proper context clearly shows that his argument related to Noland's voluntary statement, and not to his mention of Miranda. See J.A. at 1415-16. Indeed, it would have made little sense for the prosecutor to have argued that Noland's invocation of his right to a lawyer rebutted evidence of insanity when much more inculpatory and direct evidence -- Noland's curiosity that he was not being mistreated by the police after having killed two people -- was available. Because trial testimony only made passing reference to Miranda, and the prosecutor did not specifically exploit Noland's exercise of his Miranda rights, we find no Greenfield error.

C.

Third, Noland claims that his trial counsel rendered ineffective assistance at both the guilt-innocence and penalty phases of trial in

violation of the Sixth Amendment. We agree with the district court that this claim has no merit.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-prong test for determining whether assistance of counsel was so defective as to require reversal of a conviction or sentence. First, the defendant must establish that counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms. Id. at 687-88. Second, he must establish that the deficient performance prejudiced the defense to the extent that he was deprived of a fair trial. Id. at 687.

Initially, Noland contends that he was not afforded a fair and adequate hearing in state post-conviction because the state court refused to allow an attorney to testify as an expert as to what constitutes the objective standard of reasonable competence for a lawyer trying a death penalty case. We agree with the district court that when an expert witness is not in a better position than the fact finder to render an opinion on a matter, it is not error to exclude that witness' testimony. See J.A. at 1353-54. Under North Carolina law, the trial court is the finder of fact in a motion for appropriate relief. See N.C. Gen. Stat. § 15A-1413 (1997). Noland's expert was in no better position than the trial court judge, who had tried a number of capital cases, J.A. at 390, to explain the general standard of practice and to assess the adequacy of Noland's trial counsel. Noland was therefore not prejudiced in his state court hearing, and is not entitled to remand for further factual development by the district court.

1. Guilt-Innocence Phase

In the district court, Noland argued that four errors by trial counsel fell below Strickland's objective standard of reasonable performance. J.A. at 1360-62. These issues can be reduced essentially to two contentions: 1) trial counsel failed to prepare an adequate insanity defense, and 2) trial counsel failed to challenge Noland's capacity to stand trial.

As to counsel's preparation for an insanity defense, the most serious allegation by Noland is that the defense presented no expert witness to testify that he was insane at the time of the murders. The

13

prosecution relied on this lack of evidence in its closing argument to the jury. See J.A. at 1406. Noland claims that failure to present an expert to testify that he was legally insane fell below reasonable standards of professional competence.

The decision not to find such an expert, however, was a deliberate trial strategy by defense counsel. The record indicates that defense counsel had recently been "burned" in other trials by relying on expert witnesses who were derided by prosecutors as the"swami from New York" and the "shrink from California." J.A. at 270. Noland's lawyers petitioned the trial court to appoint a psychiatrist to determine both his competency to stand trial and his mental state at the time of the crimes. See J.A. at 268-69. Dr. Billy Royal, a psychiatrist on staff at a state mental hospital, evaluated Noland but was unable to form an opinion as to his sanity at the time of the crimes. Defense counsel presented the testimony of Dr. Royal at trial, who described Noland's history of mental illness and his mental state at the time the crimes occurred. Defense counsel relied on this testimony and argued to the jury that it was their responsibility, not that of an expert, to determine whether Noland was legally insane. Strickland counsels that trial lawyers must have wide latitude in making tactical decisions. Strickland, 466 U.S. at 689. Defense counsels' request for a psychiatrist and use of Dr. Royal at trial suggest that their efforts were within the range of reasonable professional conduct.

Second, Noland argues that his counsel was ineffective for not asking the court to reevaluate his competency during the trial. Noland points out that defense counsel at trial did not"feel comfortable" predicting Noland's behavior. See Appellee's Br. (filed July 21, 1997) at 41. Noland argues that this disquietude would have compelled a reasonable lawyer to interrupt the proceedings and challenge Noland's competency to stand trial. However, we find this evidence insufficient to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 668 U.S. at 689. In sum, Noland's counsel rendered effective assistance at the guilt-innocence phase of the trial.

2. Penalty Phase

In the district court, Noland presented 11 instances of what he alleged were errors by his trial counsel at the penalty phase that sat-

isfy Strickland's test for ineffective assistance. J.A. at 1354-55. Although Noland does not specifically enumerate his contentions on appeal, they can be grouped into three colorable issues: 1) that defense counsel presented no mitigating evidence and was unprepared at the sentencing phase; 2) that defense counsel did not consult with Noland in their decision not to present evidence at the sentencing phase; and 3) that defense counsel opened the door for the prosecution to argue that his crime was especially heinous, atrocious, or cruel.

Although several witnesses were prepared to testify on Noland's behalf at the sentencing phase, his trial counsel decided not to present their testimony to the jury. Noland's counsel presented no evidence at the sentencing phase; the sentencing phase consisted solely in the arguments of counsel. The failure to present mitigating evidence, however, is not per se violative of Strickland's performance prong. See Turner v. Williams, 35 F.3d 872, 900-03 (4th Cir. 1994), overruled on other grounds, O'Dell v. Netherland, 95 F.3d 1214 (4th Cir. 1996).

This decision not to present mitigating evidence did not violate Noland's right to effective counsel. First, Noland presented much of his mitigating evidence during the guilt-innocence phase: Noland's mother and sister both testified as to his love for his children and previous good relationship with the victims, and Dr. Royal testified as to Noland's mental disorders. Had these witnesses testified again, their testimony would have been cumulative. Second, while Noland points out that several witnesses were prepared to testify at the penalty phase, he does not indicate how their testimony would have been different from the evidence already presented at the guilt-innocence phase. Trial counsel cannot be faulted for deciding not to present witnesses whose testimony would only reiterate what had already been presented during the guilt phase of the trial. We agree with the district court that trial counsel's decision not to present mitigating evidence was sound trial strategy and therefore within the objective standard of reasonable performance required by Strickland .

Second, Noland argues that counsel was ineffective for failing to discuss with him the decision not to present mitigating evidence. Counsel has a duty to keep her client informed of important developments in the trial and "to consult with the defendant on important

15

issues." Strickland, 466 U.S. at 688. Noland's counsel performed that duty in this case. It appears from the record that counsel informed Noland of their decision not to present mitigating evidence at the penalty phase. J.A. at 278. Noland was also aware of his right to testify at the penalty phase, but when informed by counsel that they did not intend to present evidence, Noland did not disagree or ask any questions. J.A. at 278. Trial counsel's actions in this respect did not violate Noland's right to effective counsel under Strickland.

Finally, Noland argues that his counsel erred by submitting the absence of the "especially heinous, atrocious, or cruel" (HAC) aggravating factor as a mitigating factor, opening the door for the prosecution to argue that Noland's crime was especially heinous, atrocious, or cruel. Prior to sentencing, defense counsel had successfully argued to the judge that the crimes were not sufficiently heinous, atrocious, or cruel for the jury to consider the HAC aggravating factor. But in its list of explicit mitigating factors to be submitted to the jury, defense counsel inexplicably included a statement that Noland's crime was not especially heinous, atrocious, or cruel, thereby opening the door for the prosecution to argue this issue.

When it is possible to resolve a Strickland claim on the prejudice prong, we may do so without deciding whether counsel's conduct was outside the range of reasonable competence. See Strickland, 466 U.S. at 697. In this case, whether or not counsel's decision was outside the range of reasonable competence, there is no reasonable probability that but for this alleged error the result would have been different. Whatever prejudice could have occurred as a result of counsel's decision apparently did not; the prosecutor did not emphasize the especially heinous, atrocious, or cruel nature of this crime at closing argument. Also, the absence of the HAC aggravating factor was only one of 17 mitigating factors submitted to the jury. There is simply no reasonable probability that had it not been submitted, the jury would have rendered a different verdict.

D.

Finally, Noland argues that although a pre-trial examination found him competent to stand trial, see J.A. at 269, he became incompetent during the course of trial and his conviction and sentence therefore

16

violated his right to due process of law. The district court found that Noland was provided a full and fair hearing on this issue in his state post-conviction attack, and that the state court's finding was presumed to be correct under 28 U.S.C.A. § 2254(d) (West 1994) (pre-AEDPA).

At the post-conviction hearing, the state court judge heard testimony from Noland and his trial counsel that Noland was incompetent to stand trial. The state court also considered Noland's relevant mental health records and medical evaluations. From this information, the state court judge made a written factual finding that Noland "failed to establish that at the time of his trial he was . . . unable to understand the nature and object of the proceedings against him, to comprehend his own situation with reference to them, or to assist in his own defense." J.A. at 261. The state court's consideration of this matter adequately developed the material facts and provided Noland a full and fair hearing, and is therefore presumed to be correct under § 2254(d), notwithstanding Noland's argument that the state court did not consider the affidavit of a psychiatrist who evaluated Noland after the post-conviction hearing. See Appellee's Br. (filed July 21, 1997) at 49.

V.

For the reasons articulated above, the district court erred when it granted Noland's petition and ordered the State to resentence him. The writ should have been denied as to all of Noland's claims. The district court's order granting the writ is vacated and the matter is remanded to the district court for the entry of an order denying the writ in its entirety.

REVERSED IN PART AND AFFIRMED IN PART

17