Chief Justice MARTIN
concurring.
I fully join the majority opinion. The Constitution of North Carolina requires that the General Assembly “prescribe a procedure, in addition to impeachment and address set forth in this section ... for the censure and removal of a Justice or Judge of the General Court of Justice.” N.C. Const, art. IV, § 17(2). The constitution thus provides for only three methods to discipline sitting judges: impeachment, address, and “a procedure” prescribed by the General Assembly.
The procedure that the General Assembly has, in fact, prescribed establishes the Judicial Standards Commission (JSC) as the sole mechanism by which sitting judges may be disciplined or removed. See N.C.G.S. §§ 7A-374.1 to -377 (2015). Indeed, the statutory text specifically *277 mandates that “[t]he procedure for discipline of any judge or justice of the General Court of Justice shall be in accordance with this Article.” Id. § 7A-374.1. Judges therefore cannot be disciplined or removed in any way other than impeachment, address, or the statutory procedure that the General Assembly has devised.
By initiating disciplinary proceedings against a sitting judge for conduct that the judge engaged in while on the bench, the State Bar is trying to circumvent both the constitution and the prescribed statutory procedure. I write separately to note the wisdom of the overall scheme that the General Assembly has prescribed, and to elucidate why the law should not expose sitting judges to discipline by the State Bax for actions that they take while they are members of the General Court of Justice.
The General Assembly’s procedure places recommendations for judicial discipline and removal in the hands of the JSC and final decisions on discipline and removal in the hands of this Court. Other than the JSC’s power to issue private letters of caution, see id. § 7A-377(a3), the JSC functions solely “as an arm of the Court” that “conduct[sj hearings for the purpose of aiding the Supreme Court in determining whether a judge” should be disciplined or removed from the bench. In re Hardy, 294 N.C. 90, 97, 240 S.E.2d 367, 372 (1978).[1] This procedure is sound because it preserves judicial independence. In the words of United States Supreme Court Justice Stephen Breyer, judicial independence is important because the justice that stems from proper adjudication “is only attainable... if judges actually decide according to law, and are perceived by everyone around them to be deciding according to law, rather than according to their own whim or in compliance with the will of powerful political actors.” Stephen G. Breyer, Judicial Independence in the United States, 40 St. Louis U. L.J. 989, 996 (1996). For society to be governed by the rule of law, judges must be able to apply the law dispassionately, “without fear of retribution or the need to curry favor.” See Charles Gardner Geyh et al., Judicial Conduct and Ethics § 1.04, at 1-10 (5th ed. 2013). If a judge is fearful that a lawyer or group of lawyers who appear before her will attempt to expose her to discipline, then she *278 may not be able to act according to her best legal judgment in the cases that come before her. This is just one example of why judges must, to the greatest extent possible, be free from all outside pressures—political, financia^ and personal—that could affect their ability to act with fairness and impartiality.
Judges, of course, need to be held accountable when they act in ways that do not befit a judge. Otherwise, public trust and confidence in the courts would erode. Judges cannot be above the law, and that is why the JSC exists. The JSC arose out of the Courts Commission of 1971’s recommendation that a disciplinary process be created that would, as the majority notes, balance the need for judicial independence with the need for judicial accountability. See State of N.C. Courts Comm’n, Report of the Courts Commission to the North Carolina General Assembly 19-30 (1971) [hereinafter Courts Commission Report]. The JSC’s sole mission is to ensure that judges conduct themselves in accordance with the Code of Judicial Conduct. See N.C.G.S. § 7A-376. Because this mission is the one goal that unites all of the members, of the JSC—which has a diverse set of members culled from the bench, the bar, and citizens who are laypeople in the law, see id. § 7A-375(a)—the JSC is far less prone to being influenced by outside motives than other bodies may be. The JSC, with the help of this Court’s oversight, is therefore uniquely positioned to balance judicial independence and judicial accountability.
Furthermore, because the JSC is duty-bound to enforce North Carolina’s Code of Judicial Conduct, it is duty-bound to uphold judicial independence by the very terms of the Code. The very first words of the Code’s Preamble state that “[a]n independent and honorable judiciary is indispensable to justice in our society,” and the Code’s first canon states that “[a] judge should uphold the integrity and independence of the judiciary.” Code Jud. Conduct pmbl., Canon 1, 2016 N.C. R. Ct. (State) 509, 509. The Code that the JSC enforces thus places judicial independence at the very center of the values that the JSC must uphold.
Other state supreme courts have long since concluded that a system in which attorneys discipline judges is inconsistent with the goal of judicial independence and is contrary to good public policy. For instance, at the mid-point of the twentieth century, the Oklahoma Supreme Court held that lawyer disciplinary bodies cannot discipline members of the judiciary because it “would result in nothing more than discord, and could result in confusion, pernicious partisan political activity concerning the judiciary, and other results not beneficial to the administration of justice.” Chambers v. Cent. Comm. of Okla. Bar Ass’n, 1950 OK 287, ¶16, 203 Okla. 583, 586, 224 P.2d 583, 586-87 (1950). Some years later, *279 the Alabama Supreme Court concluded that, “regardless of how honorable the motives of the would-be prosecutors may be,” it is proper to shield judges from discipline by lawyers acting through the State Bar so that judges “may remain free to function without fear or favor.” Ala. State Bar ex rel. Steiner v. Moore, 282 Ala. 562, 566, 213 So.2d 404, 408 (1968). Indeed, mindful of the need to “maintain and restore public confidence in the integrity, independence, and impartiality of [its] judiciary,” every state “has established a judicial conduct organization charged with investigating and prosecuting complaints against judicial officers.” Cynthia Gray, How Judicial Conduct Commissions Work, 28 Just. Sys. J. 405, 405 (2007). And in all but two states, “the state supreme court has the final word” on the appropriate disciplinary measure to impose on a sitting judge. Cynthia Gray, State Supreme Courts Play Key Role in Judicial Discipline, 86 Judicature 267, 267 (2003). The JSC as it exists in North Carolina thus mirrors the national trend.
For all of these reasons, the best way to ensure judicial independence is to place the JSC and this Court—and no other individual or entity—at the helm of non-impeachment proceedings to discipline or remove judges.
Additionally, there would be practical problems if both the JSC and the State Bar had the power to discipline sitting judges for acts that they perform while they are on the bench. For example, a judge may be loath to enter into a stipulated disposition with the JSC—even though those dispositions are an effective way to resolve disciplinary disputes in a manner that both does justice in individual proceedings and preserves the public’s trust and confidence in the judicial system as a whole— because doing so could adversely affect the judge’s ability to defend against a disciplinary proceeding by the State Bar.
Placing the State Bar at the helm of proceedings to discipline judges would also undermine the judiciary’s inherent authority to discipline the attorneys that appear in the General Court of Justice. Part of a judge’s role is to “take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware.” Code Jud. Conduct Canon 3B(3), 2016 N.C. R. Ct. (State) at 510; see also N.C.G.S. § 84-36 (2015) (clarifying that the creation of the State Bar does not “disabl[e] or abridg[e] the inherent powers of the court to deal with its attorneys”); Sisk v. Transylvania Cmty. Hosp., Inc., 364 N.C. 172, 182, 695 S.E.2d 429, 436 (2010) (“[A] court possesses inherent authority to discipline attorneys.”). This Court has characterized this power as one of “two methods for enforcing attorney discipline.” Sisk, 364 N.C. at 182, 695 S.E.2d at 436 *280 (citing In re Delk, 336 N.C. 643, 550, 444 S.E.2d 198, 201 (1994)). If the State Bar also had the power to discipline judges, judges might be hesitant to exercise their power to discipline attorneys because of the fear of a disciplinary counterattack.
A system in which the State Bar assumes the authority to discipline judges would therefore inevitably impair a judge’s ability to perform an important judicial function. It could also place the members of the bench in a no-win scenario because, if a judge were afraid to exercise her inherent powers over attorneys who had engaged in unprofessional conduct, she would be guilty of violating Canon 3B—and then she herself would need to be disciplined. The disciplinary process envisioned by the State Bar would be like having the batter critique the umpire’s ball and strike calls, rather than letting the umpire call pitches as he sees them. Under the State Bar’s process, a judge would not be free to follow the law as she sees it when considering matters of attorney discipline. The result would be that the justice system would lose a key component of the very public trust that both the State Bar and the JSC are designed to protect and promote.
Furthermore, the State Bar’s investigative process could dramatically interfere with the performance of a judge’s duties. Under the JSC’s process, the matter remains confidential until this Court issues an order of “public reprimand, censure, suspension, or removal.” N.C.G.S. § 7A-377(a6). This ensures that a judge wrongly accused of misconduct is protected against “unjustified public attack.” Courts Commission Report at 25. But the State Bar’s process does not preserve confidentiality once the State Bar’s Grievance Committee has found “probable cause to believe that the attorney is guilty of misconduct justifying disciplinary action” and has directed counsel “to prepare and file a complaint against the respondent.” 27 NCAC IB .0113(a), (h) (Oct. 8, 2009); 27 NCAC IB .0133(a)(1) (Sept. 22, 2016). If a judge were subjected to this process, and an unjustified public attack became public knowledge before the judge was actually found to have committed misconduct, a judge might want to steer clear of even the possibility that someone would bring a grievance against her. That, in turn, could affect how she. decided the cases before her and compromise her ability to faithfully follow the law. This practical difference in the State Bar’s process would, once again, be inconsistent with the very notion of judicial independence.
In sum, the comprehensive and well-designed scheme prescribed by the General Assembly preserves judicial independence and avoids practical concerns that could result from a process involving a greater number of disciplinary bodies. The scheme envisioned by the State Bar, *281 by contrast, would undermine judicial independence and would present a number of practical problems. Judges must decide according to the law, not based on outside pressures. When judges are free to do so, this in turn increases public confidence in the courts. The current constitutional and statutory scheme, which establishes the JSC process as the sole means to discipline sitting judges for conduct committed while an incumbent judge, thus maximizes the public’s trust in the courts and enables judges to do justice in every case that comes before them. These are goals of both the judiciary specifically and the legal profession as a, whole. And the General Assembly has wisely borne these goals in mind in its statutory procedure for disciplining sitting judges. I therefore concur fully in the majority opinion.
Justice EDMUNDS joins in this concurring opinion.

. Before 2013, the JSC could issue public letters of reprimand without this Court’s permission. See, e.g., N.C.G.S. § 7A-377(a4) (2011); cf. id. § 7A-377(a4) (2013). But it has always been within this Court’s sole discretion whether to accept the JSC’s recommendation to censure or remove a judge. See In re Hardy, 294 N.C. at 97, 240 S.E.2d at 372 (noting as of 1978 that the JSC’s “recommendations are not binding upon the Supreme Court, which will consider the evidence on both sides and exercise its independent judgment as to whether it should censure, remove[,] or decline to do either" (quoting In re Nowell, 293 N.C. 235, 244, 237 S.E.2d 246, 252 (1977) (per curiam))).